(Reap. Dec. 10634)

A. N. DERINGER, INC., ET AL. *v.* UNITED STATES

Entry No. F–3042, etc.

(Decided December 12, 1963)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiffs.

*John W. Douglas*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the defendant.

DONLON, Judge: At a term of court held at Rouses Point, N.Y., plaintiff moved to consolidate for purposes of trial an aggregate of

1,392 appeals from appraisements at several ports along the Canadian border, as follows:

| | | | |
|---|---|---|---|
| Champlain, N.Y. | 110 appeals | Rouses Point, N.Y. | 1,249 appeals |
| Highgate Springs, Vt. | 7 appeals | St. Albans, Vt. | 23 appeals |
| Malone, N.Y. | 2 appeals | Alexandria Bay, N.Y. | 1 appeal |

The appeals were consolidated. A schedule, marked schedule A, identifying by reappraisement appeal number, name of plaintiff, and port of entry, each of these 1,392 consolidated appeals, is annexed hereto and is made a part of this decision and of the judgment entered herein.

The merchandise in issue is described as steam traps, product of Canada, exported to the United States over a period of years from 1951 through 1956. All of these steam traps were appraised on the basis of cost of production. Plaintiff does not challenge the basis, but contends that the cost of production, if properly computed, would be less than the cost of production as determined by the appraisers.

In an earlier litigation substantially the same issue was before the court. *A. N. Deringer, Inc.* v. *United States*, 44 Cust. Ct. 630, Reap. Dec. 9656; affirmed, *United States* v. *A. N. Deringer, Inc.*, 46 Cust. Ct. 762, A.R.D. 127; appeal dismissed, *idem*, 48 CCPA 169. Four appeals to reappraisement were there consolidated. The decision of the trial judge was for plaintiff. The decision was affirmed. On the basis of the evidence there of record, it was found that the presumption of correctness attaching to the appraisement had been overcome and that plaintiff had proved, by competent evidence, the several values that are reflected in the decision and judgment order.

Defendant has declined to follow this earlier decision in valuing the steam traps involved in the appeals now before the court, except as to certain traps (shown on schedule A of the decision in Reap. Dec. 9656, *supra*) the value of which has been stipulated under the prior decision. This litigation, in substantial part, is a retrial of the same issue before the court in the prior case, on a record that includes newly adduced evidence, together with the previous record which has been incorporated into the present record. (R. 133.)

In open court, the parties stipulated that, in those appeals in which the merchandise is of the "same types" as the merchandise of Reap. Dec. 9656, and where the dates of importation were within the same period as that of the merchandise of the prior decision, the record in Reap. Dec. 9656 may be incorporated and, as to such merchandise, the consolidated appeals were submitted on the basis of the earlier decision. (R. 9.) The merchandise, subject of decision in Reap. Dec. 9656, consisted of four types of steam traps, as follows:

> With solid cover, designated S,
> With glass cover, designated S,
> With glass cover, designated P Junior,
> With solid cover, designated P Junior.

The periods of importation in those appeals were December 1951, December 1952, and December 1953.

The stipulation was made of record. The steam traps and periods of importation are identified in Reap. Dec. 9656, *supra*.

All official papers in these reappraisements were put in evidence. (R. 13, 129.)

Mr. Donald E. Tomalty was called by plaintiff to testify. He had also testified in the earlier case, in 1959. At the time of his previous testimony, he was general sales manager of Velan Engineering, Ltd., exporter of these steam traps. He terminated his Velan employment in April 1961. As sales manager of Velan, his duties were to promote sales, organize areas of representation, and appoint exclusive manufacturers' representatives in those areas. (R. 24.) Prior to testifying in this case, he had read the transcript of proceedings in the earlier case, in order to refresh his recollection as to his earlier testimony. (R. 14.)

Mr. Tomalty testified that he was familiar with the various types of steam traps of this litigation, which are identified on plaintiff's schedule of merchandise (exhibit 6), and that all of these items were exported from Canada during the years 1951 through 1956. (R. 17.) Basically, all of these steam traps operate on the same principle, but different materials are used for different applications; i.e., a cast-iron body for low-pressure service, and forged steel or cast steel for high-pressure service. These are examples of variations in the different models. (R. 17.) Mr. Tomalty also stated that all of the steam traps identified in exhibit 6 are used in the same way, namely, to stop steam and discharge condensate. The sales policies, and the methods of sale and of distribution of the steam traps in this case, were no different from the policies and methods as to which he testified in the earlier case. (R. 18, 19.) Mr. Tomalty said there were seven other Canadian manufacturers of steam traps that are in competition with Velan, naming as such competitors, J. A. Gosselin Co., Ltd., of Drummondville; Trane Co. of Canada, Ltd.; Dunham-Bush (Canada), Ltd., Ontario; Galt Brass Co., Ltd., Ontario; Sarco Canada, Ltd., of Toronto, Ontario; H. O. Trerice Co. of Windsor, Ontario; and Darling Bros., Ltd., of Montreal. He stated that, if he were asked the same questions here as in the prior case, his testimony on the earlier trial as to the sales policies of those companies and as to the operation of the steam traps would be the same with regard to the steam traps of this litigation, identified on exhibit 6. (R. 19, 20.)

On cross-examination, Mr. Tomalty gave the price range of particular types of steam traps in different years. (R. 20.) The prices varied. He stated that a discount of 35 per centum was allowed off list price to Velan's exclusive representatives throughout the United States. Prices varied for the same trap and, at least as to the S Univer-

sal standard trap, were related not to the connection, that is, to its size (½ inch, ¾ inch, or 1 inch), but to pressure per square inch, which is known as PSI. Thus, the list price of an 0–50 PSI steam trap was about $2 cheaper than the list price of an 0–200 PSI steam trap. (R. 22.) Steam traps with an outside temperature controller adjustment had a higher list price, covering the additional cost of that accessory. (R. 23.) Velan printed list prices for its steam traps; and area representatives sold on the basis of the list prices, consonant with sales policy. (R. 25.) Additional types of traps were identified by Mr. Tomalty, and he identified also their distinctive features and prices in different years, to the best of his recollection. (R. 25 through 31.)

Examined as to his knowledge of the prices at which Velan steam traps were actually sold and as to the prices received, as distinguished from list prices, Mr. Tomalty stated that he knew only the list prices and not actual selling prices, since he had nothing to do with billing, invoicing, receipt of payment, or books of account. (R. 35.) He did not sell directly since sales were made through manufacturers' representatives. He was Velan sales manager from what he called the organizational point of view. (R. 36.) On occasion, he saw orders as they came in from manufacturers' representatives, showing their sales. The price in such cases was normally the list price, less usual discount; but discount varied with circumstances. He recalled discounts as high as 45 per centum on large orders, and this he said was neither unusual, nor was it general. (R. 38, 39.)

Mr. George E. Wilson, office manager for Velan in charge of personnel, credit, and accounting, since December 1958, testified that he endeavored to obtain from competitive manufacturers of steam traps, those previously identified as such by Mr. Tomalty, data as to their margin of profit on sales of steam traps from 1951 through 1956. He wrote letters to them, which he sent by registered mail, asking what their margin of profit was in those years. He received replies from all of these concerns save Sarco Canada, Ltd. Copies of his letters and of the replies he received are in evidence. (Exhibit 7; R. 40 through 44.) No information as to profit was disclosed to him by any one of these concerns.

Mr. Wilson compiled the list of steam traps described in exhibit 6, by actually examining copies of customs invoices which he had obtained from A. N. Deringer, Inc., customs broker, and the plaintiff herein as to each year. (R. 124.) He went through each invoice that was included in a customs entry, and he drew off a list of the various steam traps. (R. 48.) He examined the invoices himself, and he supervised the typing of exhibit 6. The figures shown on exhibit 6 as plaintiff's claimed cost of production were given to him by Mr. Henry Lonn, Velan's chartered accountant. The invoices from which Mr. Wilson worked were available to him as recently as

4 or 5 weeks before trial. (R. 50.) The descriptions used to identify items in exhibit 6 are the exact descriptions in the customs invoices, with or without other words of description. (R. 124.) Customs invoices, part of the official papers, were initialed by Mr. Wilson in reappraisement Nos. 58/24349 and 58/24350. (R. 127 through 131.)

Mr. Henry Lonn, a chartered accountant who had testified in the prior case, testified also at this trial. He worked for Velan from 1950 to November 1955, and, after an interval, he returned to work for Velan about March 1957 and had continued in that employment to the date of testimony (September 1962). He is in charge of all accounting for Velan, recording transactions, and preparing profit and loss statements. Cost records are kept under his supervision. He obtained the figures which plaintiff claims as cost of production, exhibit 6, from Velan's books and records. He computed the costs of the various items in the same manner as he had computed the costs of items in the earlier case, Reap. Dec. 9656. If asked the same questions as in the earlier case, his answers would be the same, except that for different models of steam traps and in different years the figures arrived at would be different. His method of arriving at cost of production, however, was the same. (R. 54, 55.)

He described, as follows, the method by which he computed the cost of producing the items listed in exhibit 6:

First, he obtained a drawing of each steam trap from the engineering department, and on this drawing the several parts of the steam trap were enumerated. From the purchasing department, he obtained purchase invoices to ascertain what price was paid for the materials. As to labor, he used time study methods, and added 20 percent to cover labor on material returned, which required additional labor, and for lost time. (R. 55.) In computing overhead, he took the profit-and-loss statements, which he kept on a calendar year basis, and calculated a percentage for expenses. Since actual net profit as shown in the books was below the minimum required by statute to be included in cost of production, he took 8 percent as the profit, in arriving at final cost. He checked the figures of exhibit 6 after they were typed. (R. 56.)

Mr. Lonn testified that, in ascertaining the profit on steam traps for the year 1951, he used the figures from his 1951 profit-and-loss statement. (R. 57.) Cost of materials and labor was fairly constant during each year involved. (R. 60.) He stated that the items described in exhibit 6 were broken down according to connections, ½ inch, ¾ inch, or 1 inch, and according to PSI; viz, ½ inch with 50 PSI, ¾ inch with 50 PSI, etc. For materials, he went to the actual drawing of each type of steam trap. He computed labor costs from time studies. The aggregate of these costs is shown in the first column of exhibit 6.

As to general expenses, Mr. Lonn said he used actual profit-and-loss figures in each year, taking into consideration selling, administration, and financial expenses. (R. 63.) The method by which he computed general expenses was the same as that as to which he testified in the earlier case.

He computed the actual cost of packing.

As to the cost of production component for profit, inasmuch as profit in each year as shown on the books of account was less than the 8 percent minimum required by section 402(f), Tariff Act of 1930, such book profit being computed on the basis of net sales, less selling and administrative expense, he figured 8 percent of the aggregate of cost of materials and labor, general expenses, and packing. (R. 64.) He said this was the same method as to which he had testified in the prior trial. (R. 65.)

The cost of materials and labor was what it would cost ordinarily to produce a steam trap, in 1 hour's time, at a time immediately preceding the date of export and in the usual course of business. This was the method of computation he had used as to all the years 1951 through 1956. (R. 65.) General expense was Velan's usual general expense in producing steam traps in each year. (R. 65.) Packing included the cost of all containers of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States. The greatest market for steam traps, in terms both of quantity and of dollar volume, was the United States. In that market, Velan's actual profit, per books, was less than 8 percent in each of these years. (R. 66.) His testimony applied to the figures for all items listed in exhibit 6, all of which he had computed in the same way (R. 68), and these figures he obtained from cost records kept for all the years in question. (R. 70).

Mr. Lonn stated that if he were asked questions as to his computation of all items listed in exhibit 6, his answer would be the amounts which are shown under the respective headings of material and labor, general expenses, packing, profit, and the total, in exhibit 6. (R. 73.) Mr. Lonn also gave explanatory testimony as to various of the descriptions listed in exhibit 6. (R. 74 through 76.) As to items in exhibit 6, as to which Velan does not claim a cost of production, Mr. Lonn stated that he did not compute cost as to such items. (R. 77.)

On cross-examination, Mr. Lonn testified that cost of materials and labor included the cost of patterns and dies. (R. 77.) In examining invoices, preparatory to computation, he did not look at sales invoices, since he was not concerned with selling prices but only with costs. (R. 78.) Items listed in exhibit 6 were sold between 1951 and 1956. Mr. Lonn worked from customs invoices he obtained from Velan's customs broker. (R. 80.) The customs invoices did not reflect sales

prices. Actual prices might be higher or lower than the prices that are shown on the customs invoices. (R. 81.) The customs invoice would show a higher price than the cost, on exhibit 6, the first item.

Some steam traps were exported on consignment to Velan, in New Jersey and Philadelphia. Sales prices were not disclosed to United States customs authorities when steam traps were exported from Canada. (R. 82.) It was, however, stipulated by counsel on both sides that, in all importations pursuant to sale, as opposed to importations on consignment, the commercial invoices correctly show selling prices. (R. 86.) This stipulation of counsel did not include any concession by plaintiff that commercial invoice prices were actually received by Velan.

Mr. Lonn testified that entries in the Velan books of account were made under his supervision, using a regular double entry system of books, that is, cash book, sales book, purchase book, general journal, and general ledger. The books record the total of each sales invoice. Credit notes are also recorded. (R. 93.) Mr. Lonn stated that he did not consider selling price in computing his cost of production figures, because Velan was not paid the invoice price in each case. (R. 96.) Credit notes also had to be considered. (R. 97.) Credit notes were issued for steam traps which were not up to standard and for which an allowance had to be made, and these credit notes were considered in determining gross receipts in the annual profit-and-loss statement, so as to reflect in the accounts the net amount actually received on sales. (R. 97.) About one-half of all shipments were on consignment, and this practice enabled Velan to carry an inventory of steam traps in the United States for future orders. (R. 98.)

According to Mr. Lonn, the consignments and the credit notes account for the differences between commercial invoice prices, in each year, and the gross receipts that are shown in Velan's profit-and-loss statement. (R. 99.) The profit-and-loss statement reflected total operations of Velan for the entire year, including sales, commissions, and credits for merchandise sold in Canada. (R. 104.) Profit (according to the books) was less than 8 percent, both on sales in Canada and in the United States. (R. 106.)

Commissions were entered in the sales journal, Mr. Lonn testified. He said that "credit notes pertaining to representatives were automatic since they were on commission," and he entered the net amount of sales. (R. 107.) Commissions were deducted from gross sales, because sales at the end of the month were shown as net. Stated differently, he treated the commissions as additional discounts to Velan's representatives, that is, as a deduction from gross sales in arriving at the net figure for sales. (R. 107.)

Mr. Lonn stated that if commissions and credit notes, which he had used as a deduction in arriving at net sales, were added, instead, to general expenses, the percentage for general expenses shown in exhibit 6 would increase (R. 111) by the following percentages for the respective years:

> For 1951, from 34 percent to 54 percent,
> For 1952, from 40 percent to 56 percent,
> For 1953, from 72 percent to 82 percent,
> For 1954, from 61 percent to 83 percent,
> For 1955, from 55 percent to 80 percent,
> For 1956, from 44 percent to 54 percent.

These percentages are related to the aggregate of cost of materials and of labor. (R. 114.) He conceded that if general expenses were increased by thus shifting commissions and credit notes, the profit figures would also be increased, but insisted that the actual net profits realized by Velan, as shown by its books, would still be the same. (R. 116.) To the best of Mr. Lonn's knowledge, however, the figures shown as profits in exhibit 6, for purposes of computing cost of production, are correct. (R. 117.)

Defendant introduced documentary evidence as to some of the importations. Exhibit G is a purchase order and commercial invoice made out to Hawkins-Hamilton of Richmond, Va. Certain other commercial invoices are in the official papers, which were received in evidence.

Mr. John C. Fawcett, representative in Montreal of the United States Customs Service, was called to the stand by defendant. He said he has been a customs representative for 11 years. He is familiar with this case, inasmuch as he has been making a continuing investigation, over a period of years, into the values of the steam traps of this litigation. (R. 141.) On September 25, 1962, the day before he testified, he was handed a copy of plaintiff's exhibit 6. With other members of the customs service, he proceeded to consult Velan's pricelists and commercial invoices, identifying various trap models, in order to ascertain the selling prices of the items described. He had Mr. Velan go over the work that witness had done, and together they were able to agree as to the list prices of the enumerated articles. (R. 142, 147.) These list prices are noted in pencil on their work copy of exhibit 6, in a column headed "List." Another column was added, which is headed "Standard Discount." A copy of exhibit 6, with these notations, was received in evidence as exhibit H, and it shows list prices and standard discounts for the several items that are described in exhibit 6. (Exhibit H.) The standard discount, which appears as 35 percent on the first page only of exhibit H, applies as well to pencil notations on every page of exhibit 6, and for each of the years, Mr. Fawcett said. (R. 153.)

Mr. Boykin Baker, called by defendant, said that during the past 3 months before his testimony he was office manager for Kent Co., Inc., of St. Thomas, Virgin Islands. Prior thereto, over a period of 41 years, he was a United States customs agent. He, also, was familiar with this litigation. He had conducted an investigation, for the customs service, to determine whether invoices and documents that were filed with the customs entries were true and correct. To this end, he examined customs investigation reports from Montreal, customs records, other customs reports, and made inquiry of Velan customers. (R. 154.) One such customer was Biddle Purchasing Co. in New York City. He interviewed there Mr. Peter Scordo, also Mr. John Spreger, a Biddle vice president. He showed them a copy of Velan commercial invoice 11399, dated December 7, 1954, in the amount of $220.50, for five type N, ¾ inch, 300 PSI steam traps. They produced their canceled check No. 74797, made out to Velan, dated February 3, 1955, for $220.50, in payment of this invoice. They told Mr. Baker that this payment represented the full transaction as to those five traps, and that no rebate or refund was received. A photostat of the check is in evidence. (Exhibit I.) Mr. Baker placed his initials on the lower left-hand corner of commercial and customs invoices in reappraisement No. R58/18758, and testified that the merchandise shown on both those invoices was the same. (R. 161.) Mr. Baker found that Velan had issued credit notes on some shipments, but he could never tie the credit notes to any particular sales invoices, except in those cases where the credit was noted on the invoice itself. His investigation of Velan's customers indicated that there were some customer rejections of Velan merchandise. (R. 163, 164.)

Mr. Rodney Ralston, United States customs examiner at Champlain, N.Y., testified that he noted in pencil on exhibit H the numeral "1," alongside notations under the column headed "List," by which he intended to show that the figures represented sales prices as shown in Velan commercial invoices. (R. 169.) These notations apply only to the year 1951, and he understood that some one else made the same notations for other years. (R. 170.)

Certain documents, received in evidence, were identified by the witness as transactions pertinent to reappraisements of this litigation, as follows:

Exhibit J—reappraisement 59/1264,
Exhibit K— " " ,
Exhibit L— " " ,
Exhibit M— " " ,
Exhibit N— " 59/1283.

Mr. Ralph J. Chilton, retired appraiser of merchandise for the St. Lawrence customs district, testified that while he was in office he had

appraised the merchandise of this litigation, using cost of production as the basis of valuation. (R. 177.) He computed such cost by ascertaining, first, the cost of material and of labor and of general expenses, and then he subtracted those costs from selling price, in order to arrive at the profit factor. (R. 178.) He determined cost of production after review of foreign investigation reports and discussions with customs agents in Montreal; but he relied on his own subordinate examiners and their investigation for the factor which represented cost of materials and of labor. (R. 180.)

Mr. Eugene Kelly, customs representative in Montreal, also was called by defendant. Under instruction, he went to various plumbing supply houses which manufacture steam traps and valves, and obtained affidavits from them as to their percentages of profit. These affidavits are in evidence. (Exhibits O, P, Q.) The affidavits, as to the several manufacturers, show the percentages of gross profits on steam traps and net profits on all plumbing business, including steam traps (exhibit O); the gross profit percentage on all plumbing business (exhibit P); and the profit on steam traps (whether gross or net is not disclosed) (exhibit Q).

Mr. Fawcett, recalled to the stand, said that, in his investigation, he found evidence of "double" invoices (R. 193), the commercial invoice prices being considerably higher than the prices that are shown on the customs invoices which were filed with the entries. (R. 195.) Invoices on white paper (customs invoices) and those on yellow paper (commercial invoices), purporting to show different prices for identical merchandise, were initialed by Mr. Fawcett in the following reappraisements: R58/24343; R58/24344; R58/24347; R58/24346; R58/23931; R58/24345. (R. 196 through 205.) He said that he found similar "double" invoices in well over 90 percent of the entries he investigated. (R. 207.) Some of the invoices bear notation that credit notes were issued against an invoice. (R. 210.)

Mr. Fawcett did not know the amount of credits. He asked for these credit note figures in 1962, although the investigation had started in 1952. He has never had reason to doubt the accuracy of Velan's profit-and-loss statements. (R. 224.)

Plaintiff has shown, without contradiction by defendant's proofs or through cross-examination, the amounts it claims as the costs of materials and of labor (section 402(f)(1)) and as the cost of packing, etc. (section 402(f)(3)).

It is not as clear that plaintiff's proofs have established its claimed cost of production components for general expenses (section 402(f)(2)) and for the usual addition for profit (section 402(f)(4)). Therefore, I now turn to an analysis of the proofs of record as to those components. For brevity, they may be referred to, respectively,

as components 2 and 4, referring to the requirements of section 402(f), paragraphs 2 and 4.

As to component 2, the cost of production item for general expenses, plaintiff's testimony is that in Velan's accounts goods returned were treated as a credit against sales, not as an expense; and that Velan, in its accounts, treated commissions paid on the sale of merchandise likewise as a credit against sales. It appears that there may have been a good many of the so-called "credit notes," allowances on defective or otherwise unsatisfactory merchandise. The large volume of credit notes was said to be due to the considerable number of steam traps that were found to be defective. Mr. Lonn testified that "* * * a lot of times what we sold wasn't up to par. Maybe the fellow installing made some mistakes, then they had to fix it. We would have to give an allowance." (R. 97.)

It does not appear of record whether merchandise, already imported into the United States, and, hence, entered for customs liquidation, and thereafter found to be defective, was exported back to Canada. In fact, from Mr. Lonn's testimony, it would appear that the usual practice was to "give an allowance" to someone who fixed the trap to correct the defect. Thus, these traps remained in the commerce of the United States and are to be valued likewise for customs purposes, even though found, after importation, to be defective.

Nor was it shown whether or how the manufacture of so considerable an amount of defective merchandise had the effect of reducing the company's general expenses, that is, the "overhead" of the manufacturer. Plaintiff's witness Lonn admitted that a change in accounting method, although reflecting only such items as were found elsewhere in the books, would result in substantial increases in the general expenses (R. 111 through 114) in the years here involved, as follows:

> For 1951, from 34 percent to 54 percent,
> For 1952, from 40 percent to 56 percent,
> For 1953, from 72 percent to 82 percent,
> For 1954, from 61 percent to 83 percent,
> For 1955, from 55 percent to 80 percent,
> For 1956, from 44 percent to 54 percent.

The particular method by which a concern keeps its accounts, assigning items of general expenses to categories other than expense, does not change the nature of the items. Called by any name one likes, they are expenses for purposes of computing the cost of production of merchandise as the basis of customs appraisement.

On the evidence of record, I find that the cost of production component for general expenses probably should include selling costs, such as commissions paid to manufacturers' representatives. Plain-

tiff's proofs certainly do not support the claim it makes as to *general expenses*.

As to component 4, what the statute requires is an amount "equal to the *profit which ordinarily is added*, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind." [Sec. 402(f) (4) ; emphasis added.]

Plaintiff's proofs show an ineffectual effort to ascertain the "net" profits of competitive Canadian manufacturers of steam traps. Failing in this attempt, plaintiff relied on prooffs as to its own annual "net" profits, as shown by its book of account.

Defendant adduced testimony as to the profits of three competitive Canadian manufacturers of steam traps, from their business in steam traps, and from their businesses as a whole.

In weighing the evidence of record, it is to be borne in mind that cost of production is a secondary basis of valuation, to be used when there exists neither a foreign value nor an export value, and not even a United States value, for the merchandise to be valued. The cost of production is designed to approximate the preferred foreign or export basis of valuation. This congressional intention has been made clear, and it is a cardinal rule of interpretation for the court. *Atlas Export Co. et al.* v. *United States*, 43 CCPA 122, C.A.D. 618; *United States* v. *Damrak Trading Co.*, 43 CCPA 77, C.A.D. 611; *M. Pressner & Co.* v. *United States*, 42 CCPA 48, C.A.D. 568.

In computing either foreign value or export value, Congress required that valuation start with price, or market value, with certain costs to be added when they had not been included in such price or market value.

In computing cost of production, value starts from another base, but is designed to work toward a similar value result. First, there is computed the actual cost of the materials and direct labor that have gone into the article being valued. Second, there is computed the actual expenses, other than such materials and direct labor, general in their nature. Third, there is computed the actual cost of packing, etc., as to which there is no controversy here.

Fourth, there is computed, in order to arrive at an approximation of foreign or export value, the sum usually added as profit by other producers, in the foreign country in which production occurred. Plaintiff pleads an unrewarding attempt to obtain information as to the *net profits* of such other producers, and seeks to use, instead, its own *net profits*.

There is not a scintilla of proof that plaintiff made any endeavor to obtain information as to what sums other Canadian producers added,

as profit, to their costs in pricing their steam traps. Moreover, plaintiff offered no proof as to what sum or sums it itself "ordinarily" added, as profit, to its own costs in pricing its steam traps. There is evidence, introduced by defendant, as to the gross profits of other Canadian producers on sales of their steam traps; as to the list prices at which Velan offered its steam traps; and as to the prices in some sales of Velan steam traps, as shown by actual commercial invoices.

It appears that plaintiff misinterprets section 402(f)(4). The section does not require that, in determining cost of production value, a sum be added that is equated with the net profits plaintiff realized in the year of sale. *United States* v. *Jovita Perez*, 36 CCPA 114, C.A.D. 407 ("the profit ordinarily added * * * [is] the profit actually added . . ."); *certiorari* denied, *Perez* v. *United States*, 338 U.S. 827.

On this record, there is no evidence of the profit which plaintiff added. I find that plaintiff has failed to show, by competent proofs, the amount of the "profit which ordinarily is added" by other Canadian manufacturers in the sale of their steam traps, or that it unsuccessfully endeavored to obtain that information, or that it has shown the sum or sums which plaintiff itself ordinarily or actually added to its cost of materials and labor, plus general expenses, as profit, in arriving at its sales prices. While the last mentioned, i.e., plaintiff's own addition for profit, is not the best evidence under the statute, in some cases and under limited circumstances, absent the preferred proofs, it has been held acceptable as a substitute for the proofs which the statute requires, in order to arrive at a cost of production value that approximates what would be the export or foreign value of the merchandise undergoing appraisement.

Evidence as to one's own "net" annual profits is not what the law seeks. Testimony that the United States market was the most important market for Velan steam traps does not make proofs as to net realized profits a permissible substitute for proofs as to the profit factor that was actually or ordinarily added to basic costs in pricing the merchandise.

It appears, from proofs of record, that list prices, actual prices charged and paid on at least some sales, and the commercial invoice prices, all were substantially higher than customs invoice prices. What an importer is required to report on its entry documents is "price," and I know of no authority granted to importers to substitute, for actual price, some other figure. While it may be that commercial invoice price is not the dutiable value, its report is a requirement of entry.

Why there should be such a considerable difference between the values plaintiff claims and a market value or price reasonably related either to commercial invoice prices or to list prices, is not clear. It

is suggested that this disparity is due to the credits Velan habitually was called upon to allow for defective merchandise. Proofs of record as to the amount of such allowances are inadequate, even if they were relevant. The costs of materials and labor and of general expense to make defective merchandise surely have some impact on pricing policy, if a profit is to be earned on those items which are salable.

There has recently been handed down a decision in which the issue was, as here, the addition for profit in computing cost of production. *Montgomery Ward & Company* v. *United States*, 51 Cust. Ct. 431, Reap. Dec. 10612, decided October 30, 1963. In that case, Judge Wilson found that the presumption of correctness attaching to the appraisement had been overcome by evidence which showed, on the part of the plaintiff, that actual sales of the cameras in issue were made at prices that resulted in loss, not profit, and on the part of the defendant, that appraisement was based on list prices rather than on sales prices. Here, the situation is otherwise. Plaintiff has not shown that these steam traps were sold at prices that resulted in loss, not profit. Nor has defendant used list prices as the basis of appraisement, as is evident from the record.

Plaintiff has not borne its burden of proof as to either the profit component or general expense component of cost of production of these steam traps. Therefore, its burden of proof has not been met. The presumption of correctness attaching to these appraisements has not been overcome. *R. J. Saunders & Co., Inc.* v. *United States*, 26 Cust. Ct. 578, Reap. Dec. 7973; *Raylite Trading Co., Inc., et al.* v. *United States*, 38 Cust. Ct. 753, A.R.D. 76.

I find as facts:

1. That the merchandise of the appeals to reappraisement listed in schedule A, attached to and made a part of this decision, consists of variously described and designated steam traps, product of Canada, exported to the United States over a period of years from 1951 through 1956 shown, respectively, in said schedule A.

2. That, at the several times of exportation, such or similar merchandise was not freely offered in Canada for sale to all purchasers for home consumption or for export.

3. That, at the several times of exportation, such or similar merchandise was not freely offered in the United States for sale to all purchasers, packed ready for delivery.

4. That, at the time of exportation, the major part of such steam traps, sold in Canada, were sold for export to the United States.

5. That, the merchandise of these appeals was appraised by the appraiser on the basis of cost of production under section 402(f), Tariff Act of 1930, as amended, and neither party controverts that appraisement basis.

6. That, as to merchandise of these appeals exported from Canada in the same year and which is the same model of steam trap as recited in schedule A of the decision in the incorporated case, *A. N. Deringer, Inc.* v. *United States*, 44 Cust. Ct. 630, Reap. Dec. 9656, the cost of production of such steam traps, herein involved, which were exported from Canada in the same year as the year in which such traps were exported in the incorporated case, are the respective values thereof in the same year, as found in finding of fact No. 8 of the incorporated case.

7. That, as to all other steam traps here involved, however described and designated on the invoices of the entries in these appeals, which were exported from Canada to the United States in the years 1951 to 1956, inclusive, including those steam traps described in finding No. 6 which were exported from Canada to the United States in any of the years 1951 to 1956, inclusive, other than in the respective year or years found in the incorporated case, as recited in finding No. 6 above, plaintiff has failed to prove the amounts claimed as general expenses and as the profit ordinarily added, in the case of merchandise of the same general character as the merchandise covered by these appeals, by manufacturers or producers in Canada engaged in the production or manufacture of merchandise of the same class or kind, and also has failed to prove the sum or sums which plaintiff itself actually added for profit.

I conclude, as matter of law:

1. That, at the several times of exportation, there was no foreign, export, or United States value for the steam traps of these appeals, as such values are defined in section 402 of the Tariff Act of 1930, as amended.

2. That cost of production, as defined in section 402(f) of the Tariff Act of 1930, as amended, is the proper basis of value for the steam traps of these appeals to reappraisement.

3. That the cost of production values of those models of steam traps described in finding of fact No. 6 are the respective values, as to the several years of exportation, recited in finding of fact No. 8 (conclusion of law No. 3) of the incorporated case, *A. N. Deringer, Inc.* v. *United States*, 44 Cust. Ct. 630, Reap. Dec. 9656.

4. That plaintiff has failed to overcome the presumptively correct appraised values of all other steam traps, described and designated on the invoices of the entries in these appeals, exported from Canada to the United States during the period from 1951 through 1956, including those steam traps described in finding No. 6 which were exported from Canada to the United States in any of the said years other than the year or years set forth for such model in said finding No. 6; and that

the cost of production values of all such steam traps, save only those of finding No. 6, are the values returned by the appraiser.

Judgment will be entered accordingly.