A. N. Deringer, Inc. et al. *v.* United States (No. 5200)*

United States Court of Customs and Patent Appeals, July 28, 1966

*Barnes, Richardson & Colburn (Joseph Schwartz, of counsel) for appellants.
John W. Douglas, Assistant Attorney General, Andrew P. Vance, Chief, Customs Section, Samuel D. Spector for the United States.*

[Oral argument April 4, 1966 by Mr. Schwartz and Mr. Spector]

Before Rich, Acting Chief Judge, and Martin, Smith, and Almond, Associate Judges

Martin, Judge, delivered the opinion of the court:

This appeal is from the judgment of the Customs Court, First Division, Appellate Term,[1] affirming the judgment of the trial court in 1392 consolidated appeals for reappraisement in connection with

---

*C.A.D. 890.
[1] 54 Cust. Ct. 764, A.R.D. 182, affirming 51 Cust. Ct. 475, R.D. 10634.

certain steam traps [2] imported from Canada. The trial court found favorably to the importer as to certain of the consolidated appeals which related to the same models of steam traps that were involved in a previously decided appeal, *A. N. Deringer, Inc.* v. *United States*, 44 Cust. Ct. 630, R.D. 9656, affirmed 46 Cust. Ct. 762, A.R.D. 127, and the corresponding cases were not appealed to this court. Before us are the remaining cases in which the judgment of the trial court was adverse to the importer.

The appraisements were based on the cost of production which is conceded by the importer to be the proper basis for appraisement. However, it is the importer's position that the cost of production as determined by the appraiser is too high.

The applicable statutes, in pertinent part, read:

Section 402(f) of the Tariff Act of 1930:

COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraph (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

Section 501 of the Tariff Act of 1930:

* * * The value found by the appraiser shall be presumed to be the value of the merchandise and the burden shall rest upon the party who challenges its correctness to prove otherwise.

 *  *  *  *  *  *  *

Besides additional testimony and other new evidence introduced in the trial of the present case, the record of the aforementioned previous

[2] The Appellate Term described the function of steam traps as follows:

Steam traps are used in industrial, marine, power, chemical, and petroleum installations in connection with the use of steam. Their function is to discharge condensed steam out of the system while retaining live steam in the system. Retention of the condensate would result in an inefficient operation. The steam trap is an automatic trap, removing condensate while retaining the useful, live steam.

appeal, *A. N. Deringer, Inc.* v. *United States*, supra, was incorporated herein.

The trial court made no specific finding as to procedure followed by the customs officials in determining the appraised values but decided in favor of the Government on the basis that the importer had failed to meet his burden of proving the values it urges are correct. Although it noted some new evidence on the point, the Appellate Term concluded, as it did in the consolidated case, that the appraisement by the customs officials was erroneously made by working back from the selling prices as a basis to the various elements comprising statutory cost of production. As to the importer's claimed cost of production, the Appellate Term noted that the trial court found that the importer had shown the amounts it claims for two of the component items set out in section 402(f), cost of materials and labor and cost of packing, but held that the importer had not borne its burden of proof as to either of the other two components, general expenses and profit. Noting further that the Government did not dispute the findings favorable to the importer on the first two components, it observed that the proceedings before it called for a "review only of the trial judge's findings and conclusions relating to the items of general expense and profit within the provisions of * * * section 402(f)." Following such review, it held:

* * * consistent with the conclusion of the trial judge, that "Plaintiff has not borne its burden of proof as to either the profit component or general expense component of cost of production of these steam traps. Therefore, its burden of proof has not been met."

■ Our jurisdiction in appeals relating to reappraisement of merchandise being limited by 28 USC 2637 to questions of law, the issue in such a case has been stated to be whether the decision of the Appellate Term is supported by substantial evidence. *H. S. Dorf & Co.*, v. *United States*, 41 CCPA 183, C.A.D. 548. More particularly, the issue here is whether there is substantial evidence to support the finding that the importer has not borne its burden of proof as to the profit and general expenses components of cost of production.

The imported merchandise was manufactured and exported by Velan Engineering, Ltd. (Velan), of Montreal. In its Exhibit 6, the importer lists its claims for each of the components of cost of production, material and labor, general expense, packing, and profit, along with the total, for the various models or types of steam traps involved for each of the years in question. The record includes testimony of three of Velan's employees. They are its sales manager,[3] a chartered accountant employed as auditor and accountant, and the

---

[3] The sales manager said he was "sales manager in an organizational point of view." He stated that he "didn't do any direct selling * * *" and that he "didn't have any direct salesmen," the selling being done by manufacturer's representatives who were in business for themselves.

office manager in charge of personnel, credit and accounting. Their testimony concerns Velan's sales policies, method of sales and distribution of steam traps and computation of costs.

In considering Exhibit 6 and the testimony in support of the claimed costs set out therein, some consideration of the evidence as to the operation of Velan is in order. Velan's sales of steam traps was limited to selected distributors or manufacturer's representatives who were not salesmen but were in business for themselves. The sales to these manufacturer's representatives were made at list price, less varying rates of discount. Half of Velan's shipments were consignments to stockpiling places in New Jersey and in Philadelphia and were not sales. Merchandise so shipped on consignment was treated as inventory in the stocking places until actual sales were made. In shipping goods on consignment, Velan did not show selling prices but instead used customs invoices obtained from the customs broker.

In the cases where the merchandise being exported was actually sold, commercial invoices were used. Counsel for the parties stipulated that on exportation of goods actually sold, the commercial invoices showed actual selling prices, but counsel for the importer, in so stipulating, did not concede that the amount of such prices was actually received.

The Appellate Term discussed Velan's business practices as follows:

The basic question before us concerns Velan's practice and procedure of invoicing, billing, and granting allowances of different connotations. Important in this phase of Velan's business operations is the issuance of credit notes. Credit notes were issued to reimburse purchasers, either for defective steam traps that had been delivered, or for faulty installations that required repairs and for which Velan was responsible. Credit notes were issued for additional discounts. Credit notes were also issued as selling commissions. In presenting its claimed values (for "usual general expenses," section 402(f), *supra*, (exhibit 6, *supra*), Velan treated all amounts of credit notes, for whatever purpose issued, as deductions from gross sales. None of them was regarded as an item relating to general expenses. * * *

It then cited *United States* v. *Alfred Dunhill of London, Inc.*, 32 CCPA 187, C.A.D. 305, which considered whether a "purchase tax" was part of general expenses, quoting therefrom the following:

In our opinion the "usual general expenses" of a business are the expenses of doing business. This would include in addition to the cost and manipulation of materials, all salaries, wages and commissions, traveling expenses, advertising, rents, taxes on buildings, stationery, stenographic, telephone and telegraph expenses, costs of delivery, depreciation on plant and equipment, and other actual outlays. These are the usual general expenses of business, and profit is calculated on the difference between such expenses and receipts.

In connection with the factor of general expenses, the Appellate Term concluded:

Under the foregoing pronouncement, Velan's computation of profit, excluding, as it did, all amounts of credit notes, without regard of the purposes for which issued, as deductions from sales, is erroneous. Certainly, commissions are "usual general expenses," within the contemplation of the statute. Velan's accountant reviewed his original computations for "General Expenses," (exhibit 6, *supra*), and submitted, in the course of his testimory on redirect examination, adjusted amounts, increasing his original figures for "General Expenses," to include credit notes and commissions. The increases ranged from 10 per centum to 25 per centum, as set forth in the decision of the trial judge. However, appellants have made no attempt to break down, in separate amounts, credit notes applicable to defective products and poor workmanship, as distinguished from those issued for commissions. Under the Dunhill case, *supra*, allowances for defective steam traps and costs to repair faulty installations are not acceptable, whereas commissions are, as charges to "usual general expenses." In the absence of such detailed proof, showing specific amounts applicable to the different categories, we agree with the holding of the court below that appellants' proofs "do not support the claim it makes as to *general expenses*." [Italics quoted.]

With respect to the item of profit, the Appellate Term found it clear from the evidence "that steam traps of the same general character as those involved herein were offered for sale and sold by well established manufacturers and distributors in Canada." It also took the view that despite Velan's ineffectual effort to obtain information from its competitors, evidence of profit made on steam traps by other Canadian manufacturers was obtainable.

Concerning the margin of profit claimed for Velan's own operations[4] the court stated:

Appellant's claimed margin of profit is based on Velan's profit-and-loss statements for each of the years under consideration. The profit-and-loss statements were prepared from trial balances, drawn from the original books of entry, that include cash book, sales book, purchase book, general journal, and general ledger. It is a matter of common knowledge that a profit-and-loss statement shows all items of income and expense with the net result from transactions covering every phase of a business over a definite accounting period. Such an instrument, viewed in the light of Velan's various operations, as disclosed by the combined records before us, is not a proper foundation for the "addition for profit" under the present issue. Referring particularly to Velan's profit-and-loss statements, they must have embodied transactions covering steam traps found to be defective after exportation from Canada and upon which Velan issued credit notes. While such amounts affect receipts on sales, they are not a proper consideration in determining "profit which is ordinarily added," section 402(f)(4), *supra*, that suggests a *predetermined* amount included in selling prices or offering prices, identified herein as list prices. Whether or not merchandise becomes worthless after importation, is a contingency which is immaterial in determining statutory cost of production, the *Snow case*, * * * [*Mrs. G. P. Snow v. United States*, 24 CCPA 319, T.D. 48,767].

---

[4] The importer claimed that the profit actually realized by Velan on each of its involved models was less than the minimum of 8 percent of the sum of (1) cost of materials and labor and (2) the usual general expenses as required by paragraph (3) of section 402(f), with the result that it calculated the profit claim in Exhibit 6 on the 8 percent basis. While Velan's accountant testified that the packing cost was included in the sum used for the calculation, that cost was so low as to make only an insignificant one to two cent difference in the profit on the individual steam traps.

Velan's accountant who was responsible for the various costs entering into the claimed item of profit testified that when invoices were examined he did not look at sales invoices, but worked from customs invoices supplied by the customs broker. The customs invoices could have been either higher or lower than actual prices. Credit notes, which were used so freely in .Velan's business operations, were accepted as submitted by the billing department. The accountant make no effort to learn the purpose for which a credit note was issued, or to determine whether amounts were excessive. * * *

Applying the test required by the statute, we are satisfied that there is substantial basis in the evidence for the Appellate Term's conclusion that the importer has not borne its burden of proof as to either the profit component or general expense component of the cost of production and that it was correct in ruling, as a matter of law, that "the appraised values stay as proper values for the present merchandise."

Clearly the amounts claimed by the importer for Velan's general expenses were too low since the credits for commissions should have been included under the *Dunhill* case, supra. This is so regardless of whether or not the other credits or rebates should have been included under that item also. Considering further that those latter credits are not clarified except to the extent that some were for defective steam traps that had been delivered and some for faulty installations that required repairs, we think that there is substantial basis in the evidence for the holding that the burden of showing its claimed general expenses was not discharged by the importer.

The claimed general expenses being incorrect, and the profit usually added being taken as the minimum 8 per cent of a sum including general expenses, the claimed figures for profits likewise are incorrect. Also, there is substantial basis in the evidence for concluding that the importer failed in showing that the usual allowance for profit of other manufacturers was not reasonably available. The evidence on this point is made up of two items. The first is the statement of Velan's accountant (in the consolidated case) that he "tried" to obtain the profit made by other manufacturers in Canada but was not able to do so because "it seems it is very confidential, and nobody will disclose what they are actually doing." The other is the testimony of Velan's office manager that he wrote letters (copies of which are in evidence) asking seven other manufacturers of steam traps in Canada what their margin of profit was, received six replies which did not give him the information, and received no response from the seventh manufacturer. However, the inquiry stated that the information was desired "for statistical purposes and a review of our own operation" and made no mention of it being needed for tariff purposes. The Appellate Term noted that the Government was somewhat successful in a similar effort to get profit information. Thus a customs representative visited three Canadian companies, getting information as to gross profits and net

profits on sales of steam traps from one, gross profits in the foundry industry in Canada from another, and percentage profits on steam traps for two years from another. Noting that part of the importer's evidence to the contrary is little more than a conclusion of the witness not setting out the facts on which it is based and the rest are the results of inquiries that did not disclose the real reason for seeking the information, we think that there is substantial evidence to support the Appellate Term's view that:

* * * While Velan made an ineffectual effort to obtain information from its competitors, proof herein shows that profit on steam traps made by other Canadian manufacturers was obtainable. * * *

As stated in *United States* v. *Jovita Perez*, 36 CCPA 114, C.A.D. 407:

* * * The computation of the item of profit [under section 402(f)(4)] is not limited to any particular manufacturer or manufacturers, but rather extends to all the manufacturers of the particular merchandise under consideration as well as other manufacturers of merchandise of the same class or kind—if any—and "the amount of profit should be determined according to the weight of all the evidence bearing upon the subject."

It is thus apparent that even a correct showing of Velan's actual profit would not be enough to satisfy the statute in view of the conclusion of the Appellate Term that proof of profit made by other Canadian manufacturers of steam traps was available.

The importer points out that evidence was introduced as to how much the percentage for general expenses would be increased if both the commissions and credit notes were included under that item instead of being included as reductions in income. It urges that, if either the commissions or credit notes are part of the general expenses, then that total amount of commissions and credit notes should be added in the absence of a more detailed itemization of the two on its part.[5]

However, one objection to that procedure is, as pointed out in the Government's brief:

The defects in the appellants' evidence lie in their failure to establish the identity and to describe the details of each of the so-called credit notes to the satisfaction of the trier of fact, so that the court below, after hearing all of the competent evidence pertinent thereto, could make an *informed* determination which were and which were not properly included in "general expenses" for purposes of ascertaining cost of production.

Also that procedure is clearly barred by the failure of the importer to provide information as to the profits added by other manufacturers of steam traps for consideration in determining the profit usually added. Without a finding of profit on that basis there is no assurance that the profit figure which should be used was actually the 8 per cent minimum provided by section 402(f)(4).

---

[5] The importer concedes this would increase the 8 per cent added for profits and indicates it would not object to such action.

The importer makes the contention that the holding of the trial court and the Appellate Term did not make affirmative findings as to general expenses and profit, "but only the *negative* finding that *appellants had not borne their burden of proof* as to general expenses and profit." However, the arguments advanced do not demonstrate that there is any significant point in that contention. The characterization of the findings of the Appellate Term as negative does not enlarge our jurisdiction beyond the question of whether there is substantial basis in the evidence for those findings. Whether or not appellant satisfies its burden must be stated in the negative in certain cases.

For the foregoing reasons, the judgment of the Appellate Term is *affirmed*.