(A.R.D. 190)

ENGLISH ELECTRIC EXPORT & TRADING CO., INC., ET AL. *v.*
UNITED STATES

Entry No. 2079, etc.

## Third Division, Appellate Term

(Decided June 10, 1965)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the appellants.
*John W. Douglas*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the appellee.

Before DONLON and RICHARDSON, Judges

DONLON, Judge: On appeal to reappraisement, the appraised values in each of the 26 consolidated appeals were affirmed. Plaintiffs filed a petition for review, alleging enumerated errors in the findings of the trial judge.

This valuation controversy concerns 26 out of an aggregate of 51 entries of components for two large vertical water wheel electrical generators. The components were made to specifications in Great Britain and were assembled after importation into the United States. The assembled generators were installed at the McNary Dam on the Columbia River. The generator components were imported and entered over a period of time from November 1954 to November 1956, and at different ports. Appraisement was not made until 1960. Plaintiffs' appeals to reappraisement were then timely filed.

Appraisement was on the basis of cost of production. Plaintiffs, also, claim cost of production as the correct basis. Controversy was as to the amount of cost-of-production valuation.

The facts are somewhat involved. The record before us includes both oral testimony and documentary exhibits. Counsel filed briefs, both on review here and on trial below. Our review, of course, is confined to the errors alleged by appellants in the findings of the trial judge.

Section 402 (f), Tariff Act of 1930, effective during the period of these importations, provides that the cost of production of imported merchandise shall be the sum of four value items that are enumerated in the statute. The first three of these items are not in dispute. As to the 26 entries, such three value items, as claimed by appellants and accepted by appellee, are as follows:

Pounds sterling

|     |                                     |          |
|-----|-------------------------------------|----------|
| (1) | Materials, fabrication, labor, etc  | 691, 803 |
| (2) | General expenses                    | 112, 626 |
| (3) | Containers and coverings            | 39, 400  |

Controversy is limited to the fourth statutory value item, namely, the profit which is to be added to the first three items. The addition for profit is defined in section 402 (f) (4), as follows:

An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

It is appellants' claim that they have proved £90,096 as the profit which ordinarily was added, in the case of "merchandise of the same general character" as these generator components, by the sole manufacturer in Great Britain, there engaged during the appropriate period prior to these exportations in the manufacture of "merchandise of the same class or kind." Cutting through verbosity, the issue before us is whether appellants have sustained their burden of proof, as they contend that they have done. If appellants have done this, they should prevail. If they have not done so, and appellee contends that they have not, then appellee should prevail.

The specific dollar items, as to which appellants allege error in the findings of the trial judge, are three: $405,433.35, $82,307.88, and $175,300.

The first of these, as appellants' proofs show, is a sum that was added to price pursuant to an escalation clause in the contract for the generator components. Appellants argue that this escalation charge "forms a basic part of the higher actual cost figures" that were included by appellants in item one, as costs of materials and labor, and that this value item has been accepted by appellee.

Appellee, in its brief, evidently ignores this item. The sum of $405,433.35 is not mentioned. The brief states that there are two items under review, namely, $82,307.88 and $175,300, although appellants ask review also of the item of $405,433.35.

On page 7 of its brief, however, appellee alludes to an item of $407,764.06 (not mentioned by appellants in their assignment of errors) as a sum that "involved not only the increases in the costs of materials and labor herein, *but also included other increases in costs in the construction of the water generators not involved in these appeals.*" [Emphasis added.]

We read this statement by appellee to mean that appellee concedes, as to a figure of $407,764.06, that there were included in it costs that fall into two different categories: first, costs of materials and labor "herein," that is, of the instant generators; and, second, costs of other generators "not involved in these appeals." Appellee does not, of course, argue for inclusion, in the value of these generators, of costs attributable to *other* generators. Presumably, in the case of *these* generators, appellee had satisfied itself, before accepting appellants' claimed cost factor for materials and labor, that it was an accurate figure. Appellee has accepted the fact that the item of $405,433.35, discussed by the trial judge, was in fact a part of the cost of materials and labor. The record before us supports this position.

In view of these positions and of the record before us, we find it difficult to ascertain the reason why the trial judge noted in his opinion that the cost-of-production figures claimed by appellants do not "take into consideration" the escalation addition of $405,433.35. Whatever may have been his grounds for making this observation, the concession by appellee that the figure of $407,764.06 is partly for the costs of material and labor of these generators and the balance for noninvolved generators, coupled with the concession that appellants' claimed value item for cost of materials and labor is correct, effectively removes this item of $405,433.35 from controversy.

As to the item of $82,307.88, as to which appellants allege error, this appears to be a final billing charge, made at the end of the contract, covering charges that had not theretofore been included in earlier invoices. Appellee's proofs show that this sum of $82,307.88

was prorated by the appraiser, as an added item of cost of production without indication of the particular value item, a spread figure of 2.689 percent. Since appellee does not show to which cost-of-production factor the item was attributed, and in view of the concession as to the other three factors, we have to assume that the appraiser found $82,307.88 to be properly part of the addition for profits.

Indeed, appellants seem to think that this was what the appraiser did, for they argue that, if actual profit rather than ordinary profit is to be added, then this item of $82,307.88 would have a bearing.

The third value item listed in appellants' assignment of errors is $175,300. We defer its consideration until we have reviewed what seems to be the basic issue of law presented by the arguments of counsel.

That is the question as to what the profit addendum should be, on the record before us. Have appellants shown a profit that is "ordinarily added," in the specific statutory sense? Appellants say they have. If they have not shown such profit, then how should the addition for profit be computed? Appellee says, on the record here, actual profit is to be added.

While there is something to be said for the complaint of appellants that the appraiser did not find separately the four factors which make up statutory cost-of-production values, the record, taken as a whole, does not support that position.

There was filed with the Commissioner of Customs an agent's report, dated May 9, 1958 (before appraisement), which included a statement as to the four value factors made by the manufacturer of these generator components. This report is in evidence. It was introduced by defendant. (Exhibit A.) It was part of the Bureau record in this case at the time of appraisement in 1960. Mr. Hyman Golub, customs examiner who examined the involved merchandise, made advisory recommendations which were adopted by the appraiser, and was familiar with the appraisement, testified that the method he recommended represented the cost-of-production formula set forth in the statute. Appellee made it clear that those first three cost factors, as presented in the agent's report, were accepted by the appraiser. Appellants have not shown they were not. There is *prima facie* a showing that appraisement was made by the statutory four-part formula.

Our discussion does not concede that appellants, on the record here, are in position to make this attack. The presumption that appraisement is correct attaches to each and every element that enters into the action of the appraiser. *United States* v. *Freedman & Slater, Inc.*, 25 CCPA 112, T.D. 49241; *United States* v. *Fritzsche Bros., Inc.*, 35 CCPA 60, C.A.D. 371.

Here, the record shows that the first three of the claimed cost-of-production factors were accepted by the appraiser. Controversy is only as to the method of computing the profit factor, and as to the amount of that one factor.

What the appraiser used, as addition for profit, was the difference between the sums invoiced for the merchandise and the aggregate of the first three cost factors. That is to say, the addition for profit was taken to be the actual addition for profit. The trial judge found this correct. Appellants argue, as earlier indicated, that they have proved a profit which "ordinarily" was added, in the statutory sense, and that this ordinary profit must prevail over profit actually added.

It is conceded that the manufacturer of these generator components, English Electric Co., Ltd. of Stafford, was the sole manufacturer in England of generators such as these. Appellants' proofs include (exhibit 3) the affidavit of Geoffrey Hazlitt Wilson, assistant group works accountant of English Electric Co., Ltd. Mr. Wilson is directly responsible to the accountant; and his duties include maintaining accurate records as to cost, expense, and profit factors "connected with the many products manufactured by the Company."

Mr. Wilson recited that "after careful investigation I find that neither the Company, nor to the best of your deponent's knowledge and belief, has any other British manufacturer ever before made equipment to such specifications," after which he enumerated what these special specifications were. Mr. Wilson went on to say: "I have carefully investigated and I know that from 1954–1956 inclusive no generators of comparable size such as, or similar to, those covered by this affidavit were sold domestically in England."

Appellants do not cite these statements of their witness. Instead they rely on his statement (notwithstanding the foregoing) that the "Machines Division, which accounted for virtually the entire contract (96.2% of the total costs of the McNary Dam generators) manufactured large electrical generators, i.e., those normally above a rating of 5 MW (5000 KW) of the same general character as those supplied under the 51 invoices covered by this affidavit."

It is noted that no period of time is given as to such manufacture, nor are any facts stated from which the court could find whether the generators that were *not* "of comparable size" but to which Mr. Wilson refers, were or were not of the same general character as those in issue here. There is nothing to show that they were.

Mere conclusory statements of a finding to be made by the court are not evidentiary support for such a finding. Against a firm statement that no generators comparable in size were manufactured, and that these were built to special specifications, the mere assertion of the same witness that other generators manufactured during an unstated

period were of the same general character, but without supporting facts, is not evidence from which we can conclude that such other generators were, in truth, of the same general character in the statutory sense.

In their briefs before us, neither party discusses *United States* v. *Jovita Perez*, 36 CCPA 114, C.A.D. 407, a precedent cited by the trial judge.

There, as here, the issue resolved itself into a dispute over the profit factor to be used in cost-of-production appraisement. The trial judge held that evidence as to the profit of the Mexican manufacturer of the imported merchandise should be excluded. The appellate division modified this, finding that there was no reliable evidence as to profits of other Mexican manufacturers and that, in those circumstances, the best evidence was testimony of record as to *estimated* profits of the manufacturer.

Our appeals court reversed the decision below and remanded the case for further proceedings not inconsistent with its opinion. That opinion held, first, that cost of production could not properly be computed by starting with selling price and deducting so-called nondutiable charges, in order to arrive at dutiable cost-of-production value. To like effect, see *A. N. Deringer, Inc.* v. *United States*, 44 Cust. Ct. 630, Reap. Dec. 9656; affirmed, *United States* v. *A. N. Deringer, Inc.*, 46 Cust. Ct. 762, A.R.D. 127. Second, the appeals court, in *Jovita Perez*, held, as to the profit factor that was to be added, as follows:

* * * we hold that the allowance to be made for profit in determining cost of production herein is the amount ordinarily added by the manufacturer of the instant merchandise, because it is the only Mexican manufacturer that kept records from which the amount of the costs of production and the amount of the profit usually added can be ascertained. For the purpose of this case, the Mexican-American Flavors Co., S.A., is the sole manufacturer of merchandise of the same class or kind as the particular merchandise under consideration. *It naturally follows that the profit usually added is the profit actually added.* [*United States* v. *Jovita Perez*, 36 CCPA 114, C.A.D. 407, at pages 118, 119, emphasis in last sentence supplied.]

Cost of production requires the appraiser to find each of the four statutory elements of such value. If he merely takes invoice, or other price, and proceeds to add to or subtract from price, he has not found, as he must, the four statutory components of cost-of-production value. As earlier discussed, the record here is not as satisfactory as it might be as to how the appraiser computed the cost of production of this merchandise. There is some testimony that he did, indeed, start with invoice price and add to it the last invoiced item, $82,307.88. If so, the method would not conform to the statutory formula. However, there also is evidence, offered by appellee, in the report of the customs agent in England, showing the components of cost of production, three of which appellee says it accepted. This statement was before

the appraiser when he computed cost of production. There is also the statement of Mr. Golub, elicited on cross-examination, that the method he recommended to the appraiser did, as he believed, represent the cost-of-production formula in the statute.

Appellants charge that "no one knows what figure has been used by the government to represent the 'profit' factor." (Appellants' brief, p. 13.) That, clearly, is not so. The profit added was the difference between invoiced prices and the first three (agreed) components of cost of production. There is nothing even remotely purporting to show that any part of that addition was intended as any thing other than actual profit. In fact, as to the item of $82,307.88, appellants concede that if the profit factor properly is actual profit, then that figure of $82,307.88 "would have a bearing." (Appellants' brief, p. 12.)

There is evidence that the manufacturer of these generator components, English Electric Co., Ltd., was the sole manufacturer of such generators in England. There is evidence, also, that it did not itself make any "generators of comparable size such as, or similar to" these generators, from 1954 to 1956, inclusive. On the record here, we hold that the profit ordinarily added *in this case* is "naturally," as our appeals court said in *Jovita Perez, supra,* the profit that actually was added.

We proceed now to consider whether the disputed item of $175,300 should be included in the profit of the manufacturer.

There is no doubt that the profit actually added in the invoices did not exclude the controverted item of $175,300. That is to say, the profit which was actually added, at the time of exportation, included that sum. Appellants, while not conceding the correctness of the method, argue, as their so-called alternative claim under our holding as to the profit which is to be added to arrive at cost-of-production value, that this sum of $175,300 should be deducted from that profit.

No precedents are cited by either party in their arguments as to this item.

The essence of appellants' contention is that actual profits, if used, can often not be determined accurately until after exportation. Here, the operating inadequacies that resulted in the penalty refund of $175,300, were revealed after installation of the generators in the McNary Dam. This settlement was made after the exportation period.

Appellants rest their argument, at least in part, on that fact, saying that actual profit could not be determined until there had been a final settlement. (Appellants' brief, p. 14.)

In his affidavit (exhibit 3), Mr. Wilson makes the following statement about this item:

The item "Credit for Penalty" [$175,300] on the attached Exhibit A refers to a reduction in the contract price which was accepted and approved by the

Company, resulting from a penalty for failure of the generators to meet the rotor temperature rise requirement specified in the contract. [Exhibit 3, p. 4, par. (8).]

This uncontradicted testimony does not sufficiently establish that the financial burden of the penalty, in the amount of $175,300, was borne by the manufacturer, whose costs of production are to be computed. What the affidavit says is that it reduced the contract price. The only contract before us is the contract of the buyer with English Electric Export & Trading Co., Ltd., a wholly owned subsidiary of the English Electric Co., Ltd., recited (in the contract) as the parent company which was to manufacture the contracted equipment for its dealer subsidiary. We seem to have no evidence as to what the contract arrangements were between these affiliated English companies. All of the dealings of the buyer, the Corps of Engineers of the United States Army, so far as the record shows, were with English Electric Export & Trading Co., Ltd., and it was not the manufacturer.

Mr. Wilson, although he states that the "Company" accepted and approved the penalty, does not say whether the loss fell on the manufacturer or on the dealer subsidiary.

There is doubt, in our view, whether Congress intended that long-delayed transactions should affect the cost of production of merchandise, which is to be computed as of the time of exportation. We find no case on all fours. In *A. N. Deringer, Inc., et al.* v. *United States*, 54 Cust. Ct. 764, A.R.D. 182 (appeal pending), the importer sought, in computing cost-of-production value, to deduct allowances for defective merchandise, made after importation, as a cost of sales. The deduction was not allowed.

It is not necessary here to decide whether, when the facts of record show that the profit ordinarily added is the profit actually added, there might or might not be circumstances showing error, or other casual mischance, as to the profit that actually was added *by the manufacturer*. We do not decide that issue here, for the proofs do not raise the issue. The penalty was a risk incurred by the seller of the generators; that is, the dealer-subsidiary. There is no proof that the manufacturer had, at the time of exportation, any penalty liability in the event of latent defects subsequently discovered.

We find as facts:

1. That the merchandise of the appeals to reappraisement listed in schedule "A," attached to and made a part of this decision, consists of components for two large vertical water wheel electrical generators, manufactured in Great Britain to buyer's specifications and imported into the United States in 26 shipments during a period from November 1954 through November 1956, at different ports, for installation at the McNary Dam on the Columbia River.

2. That the contract for sale of said merchandise was made with the buyer by the English Electric Export & Trading Co., Ltd., a subsidiary of English Electric Co., Ltd., the manufacturer of the merchandise.

3. That English Electric Co., Ltd., at the times of these exportations was the sole manufacturer in England of these generator components, and during the period of exportation neither said company nor any other manufacturer in England made any generators such as or similar to the generators here under appeal to reappraisement.

4. That, at the times of exportation of said merchandise, there was added to price, pursuant to an escalation clause in the contract for purchase of the generator components of these appeals an aggregate sum of approximately $405,433.35, reflecting increased costs of materials and labor which, as a statutory item of cost of production, together with general expenses and cost of containers and coverings, is not in dispute.

5. That, after exportation of said merchandise, charges in the sum of $82,307.88, which had not theretofore been included in earlier invoices, were included in a final billing for the merchandise.

6. That the sum of $175,300 was a penalty subsequently allowed by the dealer-subsidiary because of failure of the generators to perform according to specifications; but there is no proof that this penalty was paid by the manufacturer.

7. That said merchandise was appraised on the basis of cost of production, as defined in section 402(f) of the Tariff Act of 1930.

We conclude as matter of law:

1. That, at the several times of exportation from November 1954 through November 1956, there was no foreign, export, or United States value for the generator components of these appeals, as such values are defined in section 402 of the Tariff Act of 1930, as amended.

2. That cost of production, as defined in section 402(f) of the Tariff Act of 1930, is the proper basis of valuing the generator components of these appeals.

3. That the amount of profit to be added in computing the cost-of-production value is the profit ordinarily added by the manufacturer, and on the record before us the profit ordinarily added is the profit actually added.

4. That the cost of production of the merchandise of these appeals is the appraised value.

The judgment below is affirmed and judgment will be entered accordingly.