ENGLISH ELECTRIC EXPORT & TRADING CO., INC. ET AL. *v*. UNITED STATES
(No. 5221)*

---

[2] The argument is set out in detail in the brief of Amicus Curiae.
*C.A.D. 881.

United States Court of Customs and Patent Appeals, June 16, 1966

*Allerton deC. Tompkins* for appellant.

*John W. Douglas*, Assistant Attorney General, *Andrew P. Vance*, Chief, Customs Section, *Samuel D. Spector* for the United States.

[Oral argument April 4, 1966 by Mr. Tompkins and Mr. Spector]

Before RICH, Acting Chief Judge, and MARTIN, SMITH, and ALMOND, Associate Judges

Martin, Judge, delivered the opinion of the court:

This is an appeal by the importer from a judgment of the United States Customs Court, Third Division, Appellate Term,[1] affirming the trial court's holding that the appraised values of the involved importations represented the correct dutiable values. The importations are articles constituting components of two very large electric generators of the vertical water wheel type imported from England in 26 shipments from November 1954 through November 1956.

The imported merchandise was appraised on the basis of cost of production under section 402(f) of the Tariff Act of 1930 as it existed prior to the Customs Simplification Act of 1956. Both parties concede that the cost of production is the proper statutory basis of appraisement, but the importer contends that the cost was less than that found by the appraiser.

The applicable statute, section 402(f) of the Tariff Act of 1930, reads:

*Cost of Production.*—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchan-

---

[1] Reported at 54 Cust. Ct. 811, A.R.D. 190.

dise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

The merchandise was purchased by the importer from English Electric Company, Ltd., the parent company and manufacturer, and was installed at the NcNary Dam on the Columbia River in accordance with terms of sale by the importer to the United States Army Corps of Engineers.

The importer submitted evidence which it contends shows that the four items making up cost of production under the statute are as follows:

| Items | Pounds Sterling |
|---|---|
| (1) Materials, Fabrication, Labor, etc | 691, 803 |
| (2) General Expenses | 112, 626 |
| (3) Containers and Coverings | 39, 400 |
| (4) Profit | 90, 096 |

The first three items are not in dispute and the controversy is limited to the fourth statutory item, the amount of profit that is to be added to the first three items.

As the item of profit to be added the appraiser used the difference between the sums invoiced for the merchandise and the sum of the first three items. That is, the appraiser used the actual addition for profit determined on the basis of the amount of the invoices.

The importer urges that it has proved a lesser profit, one which "ordinarily" was added in the sense of the statute, and that such figure should be used in place of the profit actually added. Thus the importer contends that the figure of £90,096 is the profit which "ordinarily is added, in the case of merchandise of the same general character" as the imported generator components, by the sole manufacturer in Great Britain engaged in the manufacture of "merchandise of the same class or kind." That figure was predicated on the profits "ordinarily" added on sales by the manufacturer of generators having a rating of over 5 MW (5000 KW), which generators the importer regards as

"equipment of the same general character" as the imported components. The principal evidence on this issue is an affidavit of Wilson, a representative of the manufacturer, wherein it is stated:[2]

* * * The more important characteristics of the said generators were as follows, and after careful investigation I find that neither the Company, nor to the best of your deponent's knowledge and belief, has any other British manufacturer ever before made equipment to such specifications:

    Type :   Vertical shaft two bracket
    Rating :   73,684 kVA
    Voltage :   13.8 kV
    Frequency :   60 cycles per second
    Speed :   85.7 RPM
    Weight :   1040 Tons
    Rotor diameter :   421"
    Stator Height :   64"
    Total Thrust :   1740 Tons

Large vertical water wheel electric generators such as those covered by this affidavit must be built to order. Their characteristics are dictated by the natural resources available (primarily quantity and head of water), the power requirements of the user, and the particular electric characteristics imposed by the system to which they are connected. I have carefully investigated and I know that from 1954–1956 inclusive no generators of comparable size such as, or similar to, those covered by this affidavit were sold domestically in England. The said two generators were manufactured during the periods September 1954 to August, 1956 inclusive in three of the Product Divisions of the Company located at Stafford, England, and referred to as (a) the Machines Division, (b) the Switchgear Division and (c) the Electronics Division.

(a) The Machines Division, which accounted for virtually the entire contract (96.2% of the total costs of the McNary Dam generators) manufactured large electrical generators, i.e. those normally above a rating of 5 MW (5000 KW) of the same general character as those supplied under the 51 invoices covered by this affidavit.

The importer emphasizes the last part of the above quotation wherein Wilson refers to large generators normally above 5 MW (5000 KW) as "of the same general character" as those for which the importations were used. The Appellate Term, however, found greater significance in the statements that no other British manufacturer ever before made equipment to the specifications of the present generators and that "no generators of comparable size such as, or similar to" those involved were sold domestically in England from 1954 through 1956.

In considering Wilson's reference to the manufacturer's generators "normally above a rating of 5 MW (500 KW)" as "of the same general character" as those in question, the Appellate Term stated:

It is noted that no period of time is given as to such manufacture, nor are any facts stated from which the court could find whether the generators that were *not* "of comparable size" but to which Mr. Wilson refers, were or were not

---

[2] The affidavit refers to the manufacturer, English Electric Company, Limited, as the "Company" and to the importer as the "Export Company."

of the same general character as those in issue here. There is nothing to show that they were.

Mere conclusory statements of a finding to be made by the court are not evidentiary support for such a finding. Against a firm statement that no generators comparable in size were manufactured, and these were built to special specifications, the mere assertion of the same witness that other generators manufactured during an unstated period were of the same general character, but without supporting facts, is not evidence from which we can conclude that such other generators were, in truth, of the same general character in the statutory sense.

The Appellate Term further stated:

There is evidence that the manufacturer of these generator components, English Electric Co., Ltd., was the sole manufacturer of such generators in England. There is evidence, also, that it did not itself make any "generators of comparable size such as, or similar to" these generators, from 1954 to 1956, inclusive. On the record here, we hold that the profit ordinarily added *in this case* is "naturally," as our appeals court said in *Jovita Perez, supra* [*United States* v. *Jovita Perez*, 36 CCPA 114, C.A.D. 407], the profit that actually was added.

We find no reversible error in the court's conclusion. ■ There is substantial evidence of record to support the view that the generators above a rating of 5 MW (5000 KW) on which the importer relies are not "merchandise of the same general character" produced by manufacturers engaged in the manufacture of merchandise "of the same class or kind" as the imported components. It follows that the "profit which ordinarily is added" under the statute is the profit actually added. *United States* v. *Jovita Perez, supra.*

However, there is controversy as to two items which have been included as part of the total cost used in determining the profit actually added. One of these is a final billing charge made at the end of the contract covering charges which the manufacturer had failed to include in the earlier invoices. The Government showed that the appraiser had prorated that sum, amounting to $82,307.88, among the 26 shipments as an added item of cost of production amounting to 2.689 percent. The other disputed item arises from a reduction in the contract price by $175,300.00 resulting from the failure of the generators, when installed, to meet a rotor temperature rise requirement specified in the contract.

In view of the Government's concession that the other three factors of cost of production as asserted by the importer were correct, the Appellate Term considered that the $82,307.88 sum added to the invoiced prices by the appraiser was treated as part of the addition for profits. Since this case is one where the profit actually added is the profit "ordinarily added" under the statute, we find that the Appellate Term's conclusion that the sum was properly included is based on substantial evidence and does not involve any error of law.

With regard to the $175,300.00 allowable, the Appellate Term noted the following statement of Wilson in his affidavit:

(8) The item "Credit for Penalty" on the attached Exhibit A refers to a reduction in the contract price which was accepted and approved by the Company, resulting from a penalty for failure of the generators to meet the rotor temperature rise requirement specified in the contract.

Although acknowledging that that testimony is uncontradicted, the Appellate Term held it does not sufficiently establish that the financial burden of the penalty was borne by the manufacturer, whose costs are to be computed. It further stated:

* * * What the affidavit says is that it reduced the contract price. The only contract before us is the contract of the buyer with English Electric Export & Trading Co., Ltd., a wholly owned subsidiary of the English Electric Co., Ltd., recited (in the contract) as the parent company which was to manufacture the contracted equipment for its dealer subsidiary. We seem to have no evidence as to what the contract arrangements were between these affiliated English companies. * * *

\*     \*     \*     \*     \*     \*     \*

Mr. Wilson, although he states that the "Company" accepted and approved the penalty, does not say whether the loss fell on the manufacturer or on the dealer subsidiary.

\*     \*     \*     \*     \*     \*     \*

* * * There is no proof that the manufacturer had, at the time of exportation, any penalty liability in the event of latent defects subsequently discovered.

As to the question whether the loss arising from the penalty fell on the manufacturer, the Appellate Term appears to have overlooked significant evidence. Thus Exhibit A, attached to the affidavit of Wilson, lists the $175,300.00 as "Credit for Penalty" and subtracts it from the other charges to the importer (Export Company) in arriving at the "Total F.O.B.U.K. port price to Export Company." Also, the witness Barnes, in a managerial position with the importer, testified on cross-examination as follows:

XQ. Now, after your generators had been completed by the sub-contractor, and they were subsequently tested by the Army, were they then found to be defective in some minor detail, as you said? A. Yes.

XQ. And was it at that time that they made a claim against your contractor, who passed the claim on to you, who passed the claim on to English for this $175,-000 reduction in price? A. The particular defect that we're talking about had no connection whatsoever to do with the erection contractor. It was one that was inherent in the design, and so the claim, or the negotiations for this reduction in contract price, was between the Army Corps Engineers and us, and then in turn our parent company in England.

We think the Appellate Term erred in overlooking that evidence that the penalty of $175,300.00 constituted a reduction in the profit of the manufacturer.

Since the appraisement here is on the basis of the profit item in the cost of production being the profit actually added, the penalty sum amounts to a reduction in the actual profit and should have been subtracted from the appraised value. The fact that the transaction involv-

ing the penalty occurred after exportation presents no difficulty since it did occur in time for evidence regarding it to be submitted to the Trial Court.

For the foregoing reasons, the judgment of the Appellate Term is *modified* and the case is *remanded* for further action consistent with this opinion.