(A.R.D. 182)

A. N. DERINGER, INC., ET AL. v. UNITED STATES

Entry No. F-3042, etc.

## First Division, Appellate Term

(Decided January 13, 1965)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the appellants.
*John W. Douglas*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the appellee.

Before OLIVER, WILSON, and NICHOLS, Judges

OLIVER, Chief Judge: In this proceeding, we review the decision of Donlon, J., reported as *A. N. Deringer, Inc., et al.* v. *United States*, 51 Cust. Ct. 475, Reap. Dec. 10634, which involved various types of steam traps, exported from Canada over the period of years from 1951 through 1956. There are 1,392 consolidated appeals for reappraisement involved, covering entries that were made at different ports along the Canadian border, as shown on schedule "A," hereto attached and made a part hereof.

Appraisement of the merchandise was made on the basis of cost of production, defined in section 402(f) of the Tariff Act of 1930, as amended.

Appellants do not dispute the basis for appraisement, but contend that the statutory cost of production is less than that found by the appraiser. The claimed values for the various types of steam traps in question are set forth in schedules titled, "VELAN STEAM TRAPS" (plaintiffs' exhibit 6).

The trial judge held that plaintiffs had shown, "without contradiction by defendant's proofs or through cross-examination, the amounts it claims as the costs of materials and of labor (section 402(f)(1)) and as the cost of packing, etc. (section 402(f)(3))," and that plaintiffs had not borne "its burden of proof as to either the profit component or general expense component of cost of production of these steam traps."

The Government (defendant below) has not disputed the lower court's conclusions, favorable to appellants' claimed values as to costs of materials and labor, and the cost of packing. Thus, the present proceeding is a review only of the trial judge's findings and conclusions relating to the items of general expense and profit within the provisions of said section 402(f). In their application for review, appellants (plaintiffs below) have set forth 14 reasons as grounds for their appeal. Without referring to each, individually, our discussion herein disposes of all.

Substantially the same issue, as that involved herein, was presented in *A. N. Deringer, Inc.* v. *United States*, 44 Cust. Ct. 630, Reap. Dec. 9656; affirmed, *United States* v. *A. N. Deringer, Inc.*, 46 Cust. Ct. 762, A.R.D. 127; appeal dismissed, *idem*, 48 CCPA 169. The record in the cited case, hereinafter referred to as the previous case, was incorporated herein. The four types of stream traps involved therein are not in controversy in this proceeding. Under the terms of a stipulation submitted at the hearing below, the trial judge sustained plaintiffs' claimed values, so far as they relate to the models of steam traps, the subject of the decision in the previous case and which are included in the shipments involved herein covering the same period of time— 1951, 1952, and 1953—as that covered in the previous case.

Before analyzing the combined records before us, consideration will be directed to the method pursued in the official appraisements of the present merchandise. In the previous case, the customs examiner, who advisorily appraised the merchandise and whose advice was accepted by the appraiser, testified that he used selling prices as a basis and worked back to estimated costs of the various elements comprising statutory cost of production. In holding that such method did not follow the formula laid down under the mandatory provisions of the statute, section 402(f), *supra*, we stated as follows:

> The appraiser's finding of cost of production, as hereinabove outlined, does not follow the controlling statute. There is nothing in the clear and unambiguous language of the statutory definition of cost of production, section 402(f) of the Tariff Act of 1930, that allows for a determination of such value through a series of deductions (estimated costs) from a selling price, as adopted by the appraiser in this case. As aptly stated by this court in *Zigmund Loew* v. *United States*, 2 Cust. Ct. 861, Reap. Dec. 4529, "Cost of production when used as a basis of finding the dutiable value of imported merchandise, as provided for in section 402(f), *supra*, is to be founded upon facts gained through experience in the manufacture of such or similar materials, and an appraisement based upon an estimate, such as we have here, is clearly erroneous."

In the present case, the appraiser appeared as a Government witness. His testimony is to the effect that, in appraising the merchandise involved herein, he relied on his line examiner—the witness in the previous case—and that he would not approve a value "unless the

examiner came up with the value that I arrived at myself, because he has to use my facsimile stamp." We, therefore, hold, as we did in the previous case, that the method employed by customs officials in finding statutory cost of production of the steam traps in question did not follow the mandatory requirements of the statute. In other words, appraisement of the present merchandise was based on a false premise. It is not a null and void appraisement, but an erroneous appraisement. *G. & H. Transport Co., Inc.* v. *United States*, 27 CCPA 159, C.A.D. 78. The effect from such an appraisement is to destroy the statutory presumption of correctness that otherwise attaches. *Carey & Skinner, Inc.* v. *United States*, 12 Cust. Ct. 352, Reap. Dec. 5975. However, appellants, having appealed for reappraisement of the merchandise, have the burden of establishing cost of production in the manner provided by law. *Mrs. G. P. Snow* v. *United States*, 24 CCPA 319, T.D. 48767. We proceed accordingly.

Velan Engineering, Ltd., of Montreal—referred to as Velan, for brevity—is the foreign manufacturer and exporter of the steam traps involved herein. Three of its employees testified. Two of them, i.e., the sales manager, and a chartered accountant of Montreal employed as Velan's auditor and accountant, testified in the previous case as well as the present one. Both witnesses stated that their testimony in the previous case concerning Velan's sales policies, methods of sales and distribution of steam traps, and computation of costs, has equal application in this case as to the various types and models of steam traps involved herein. Velan's office manager in charge of personnel, credit, and accounting, appeared as a witness only in the present case. All of defendant's witnesses were customs officials associated in some way with customs investigations directed toward determining the value of these steam traps for customs purposes. The decision of the trial judge includes a detailed analysis of the evidence adduced by both parties. Our discussion herein refers only to such portions of the combined records, relating to the elements of "general expenses" and "profit," as they are contemplated within the statutory definition of cost of production, section 402(f), *supra*.

Steam traps are used in industrial, marine, power, chemical, and petroleum installations in connection with the use of steam. Their function is to discharge condensed steam out of the system while retaining live steam in the system. Retention of the condensate would result in an inefficient operation. The steam trap is an automatic trap, removing condensate while retaining the useful, live steam.

Velan's steam traps operate on a different principle from the ordinary steam trap. No similar steam traps are on the market, either in Canada or in the United States. All of Velan's steam traps are used for the same purpose. However, prices differed for various models,

depending on pressure range, materials used, and added accessories.

Velan limited its sales of steam traps, both in Canada and in the United States, to selected distributors or manufacturer's representatives. These manufacturer's representatives are not salesmen; they are in business for themselves. Sales to manufacturer's representatives were made at list prices, less varying rates of discount.

Half of Velan's shipments were consignments to stockpiling places in New Jersey and in Philadelphia. They were not sales. Merchandise shipped on consignment was treated as inventory in the stocking places until actual sales were made. In shipping merchandise on consignment, Velan did not show selling prices. Instead, customs invoices, obtained from the customs broker, were used. Velan paid duty and freight.

When merchandise being exported was actually sold, commercial invoices were used. Counsel for the respective parties stipulated that on sales for exportation, commercial invoices showed actual selling prices, but counsel for appellants, in so stipulating, did not concede that "that is the amount that was actually received." (R. 86.)

The basic question before us concerns Velan's practice and procedure of invoicing, billing, and granting allowances of different connotations. Important in this phase of Velan's business operations is the issuance of credit notes. Credit notes were issued to reimburse purchasers, either for defective steam traps that had been delivered, or for faulty installations that required repairs and for which Velan was responsible. Credit notes were issued for additional discounts. Credit notes were also issued as selling commissions. In presenting its claimed values for "usual general expenses," section 402(f), *supra*, (exhibit 6, *supra*), Velan treated all amounts of credit notes, for whatever purpose issued, as deductions from gross sales. None of them was regarded as an item relating to general expenses. In *United States* v. *Alfred Dunhill of London, Inc.*, 32 CCPA 187, C.A.D. 305, in considering whether a so-called purchase tax should be included in "usual general expenses" under statutory cost of production, the appellate court stated as follows:

In our opinion the "usual general expenses" of a business are the expenses of doing business. This would include in addition to the cost and manipulation of materials, all salaries, wages and commissions, traveling expenses, advertising, rents, taxes on buildings, stationery, stenographic, telephone and telegraph expenses, costs of delivery, depreciation on plant and equipment, and other actual outlays. These are the usual general expenses of business, and profit is calculated on the difference between such expenses and receipts.

Under the foregoing pronouncement, Velan's computation of profit, excluding, as it did, all amounts of credit notes, without regard of the purposes for which issued, as deductions from sales, is erroneous. Certainly, commissions are "usual general expenses," within the

contemplation of the statute. Velan's accountant reviewed his original computations for "General Expenses," (exhibit 6, *supra*), and submitted, in the course of his testimony on redirect examination, adjusted amounts, increasing his original figures for "General Expenses," to include credit notes and commissions. The increases ranged from 10 per centum to 25 per centum, as set forth in the decision of the trial judge. However, appellants have made no attempt to break down, in separate amounts, credit notes applicable to defective products and poor workmanship, as distinguished from those issued for commissions. Under the *Dunhill* case, *supra*, allowances for defective steam traps and costs to repair faulty installations are not acceptable, whereas commissions are, as charges to "usual general expenses." In the absence of such detailed proof, showing specific amounts applicable to the different categories, we agree with the holding of the court below that appellants' proofs "do not support the claim it makes as to *general expenses*." [Italics quoted.]

Turning now to a consideration of the item of profit claimed by appellants, *United States* v. *Jovita Perez*, 36 CCPA 114, C.A.D. 407, is pertinent. That case involved the element of profit, on certain sugar flavoring syrup, used as the sweetening ingredient in the manufacture of Pepsi-Cola. The foreign manufacturer was Mexican-American Flavors Co., S.A., of Monterrey, Mexico, a Mexican corporation, organized by the Pepsi-Cola Co., a domestic corporation, for the purpose of manufacturing flavoring syrup used in the manufacture and bottling of Pepsi-Cola. The court found from the evidence there were four manufacturers or producers of flavoring syrup in Mexico. Of the three, other than the manufacturer of the merchandise involved therein, the court stated that none of them maintained adequate books of account or other substantial records upon which the item of profit, as required under section 402(f), *supra*, could be applied. The appellate court, therefore, held, following *United States* v. *Henry Maier*, 21 CCPA 41, T.D. 46378—

\* \* \* that the allowance to be made for profit in determining cost of production herein is the amount ordinarily added by the manufacturer of the instant merchandise, because it is the only Mexican manufacturer that kept records from which the amount of the costs of production and the amount of the profit usually added can be ascertained. For the purpose of this case, the Mexican-American Flavors Co., S.A., is the sole manufacturer of merchandise of the same class or kind as the particular merchandise under consideration. It naturally follows that the profit usually added is the profit actually added.

In this case, appellants contend that the profit ordinarily added by other Canadian manufacturers was not reasonably ascertainable, and, therefore, under the pronouncements in the *Maier* and *Perez* cases, Velan's claimed profit (exhibit 6, *supra*) is the proper allowance to be

made in determining cost of production of the present merchandise. To support the contention, appellants point to proof adduced in the previous case, and in the present case. In the previous case, Velan's accountant testified that he tried to obtain the margin of profit realized by other Canadian manufacturers of steam traps, but was unsuccessful because "it seems it is very confidential, and nobody will disclose what they are actually making," the *Deringer* case (A.R.D. 127), *supra*. In the present case, it appears that Velan's office manager sent letters to competitive manufacturers, asking for their margin of profit on sales of steam traps during the years 1951 through 1956, the period involved herein. Seven letters were sent; six replies were received (plaintiff's collective exhibit 7). In their requests, Velan stated they desired the information "for statistical purposes and a review of our own operation," letter to Sarco Canada, Ltd. (part of collective exhibit 7, *supra*). Velan received no information from any of the companies contacted. The Government (defendant below), however, was somewhat successful in a similar effort. A customs representative, stationed at Montreal, who worked with other officials in customs investigations directed toward obtaining cost of production of steam traps for appraisement purposes, testified that he went to plumbing supply houses that manufacture steam traps and valves, for the purposes of obtaining information relating to their percentage of profit. Three companies were visited. Affidavits from each are in evidence. An affidavit (defendant's exhibit O), executed by the vice president of Sarco Canada, Ltd., shows percentages of gross profits and net profits on sales of steam traps for that company's fiscal years July 1, 1953—June 30, 1954, through July 1, 1956—June 30, 1957. Gross profits for the period ranged from 51.5 per centum to 52.9 per centum; net profits ranged from 9.6 per centum to 15.9 per centum. The affidavit (defendant's exhibit P) of the president of Josam Products, Ltd., of Toronto, gives no information about steam traps, but refers to gross profit percentage in the foundry industry in Canada. In the affidavit (defendant's exhibit Q) of the president of The Arthur S. Leitch Co., Ltd., of Ontario, the affiant states that the percentage of profit on steam traps manufactured by his company was 42 per centum for the year 1956, and 28.5 per centum for the year 1957.

The Canadian market with respect to steam traps, as disclosed by the evidence immediately hereinabove set forth, is not comparable with the Mexican market upon which the *Perez* case was based. Unlike the condition shown in the *Perez* case, it is clear from evidence now before us that steam traps of the same general character as those involved herein were offered for sale and sold by well established manufacturers and distributors in Canada. While Velan made an ineffectual effort to obtain information from its competitors, proof herein

shows that profit on steam traps made by other Canadian manufacturers was obtainable. Under such circumstances, the computation of the item of profit is not limited, as stated in the *Perez* case:

* * * to any particular manufacturer or manufacturers, but rather extends to all the manufacturers of the particular merchandise under consideration as well as other manufacturers of merchandise of the same class or kind—if any—and "the amount of profit should be determined according to the weight of all the evidence bearing upon the subject."

Appellants' claimed margin of profit is based on Velan's profit-and-loss statements for each of the years under consideration. The profit-and-loss statements were prepared from trial balances, drawn from the original books of entry, that include cash book, sales book, purchase book, general journal, and general ledger. It is a matter of common knowledge that a profit-and-loss statement shows all items of income and expense with the net result from transactions covering every phase of a business over a definite accounting period. Such an instrument, viewed in the light of Velan's various operations, as disclosed by the combined records before us, is not a proper foundation for the "addition for profit" under the present issue. Referring particularly to Velan's profit-and-loss statements, they must have embodied transactions covering steam traps found to be defective after exportation from Canada and upon which Velan issued credit notes. While such amounts affect receipts on sales, they are not a proper consideration in determining "profit which is ordinarily added," section 402 (f) (4), *supra*, that suggests a predetermined amount included in selling prices or offering prices, identified herein as list prices. Whether or not merchandise becomes worthless after importation, is a contingency which is immaterial in determining statutory cost of production, the *Snow* case, *supra*.

Velan's accountant who was responsible for the various costs entering into the claimed item of profit testified that when invoices were examined he did not look at sales invoices, but worked from customs invoices supplied by the customs broker. The customs invoices could have been either higher or lower than actual prices. Credit notes, which were used so freely in Velan's business operations, were accepted as submitted by the billing department. The accountant made no effort to learn the purpose for which a credit note was issued, or to determine whether amounts were excessive. In the decision of the trial court, the record evidence, reflecting the general condition which we adopt herein, was described as follows:

It appears, from proofs of record, that list prices, actual prices charged and paid on at least some sales, and the commercial invoice prices, all were substantially higher than customs invoice prices. What an importer is required to report on its entry documents is "price," and I know of no authority granted

to importers to substitute, for actual price, some other figure. While it may be that commercial invoice price is not the dutiable value, its report is a requirement of entry.

Why there should be such a considerable difference between the values plaintiff claims and a market value or price reasonably related either to commercial invoice prices or to list prices, is not clear. It is suggested that this disparity is due to the credits Velan habitually was called upon to allow for defective merchandise. Proofs of record as to the amount of such allowances are inadequate, even if they were relevant. The costs of materials and labor and of general expense to make defective merchandise surely have some impact on pricing policy, if a profit is to be earned on those items which are salable.

For all of the reasons hereinabove set forth, we hold, consistent with the conclusion of the trial judge, that "Plaintiff has not borne its burden of proof as to either the profit component or general expense component of cost of production of these steam traps. Therefore, its burden of proof has not been met."

The conclusion is a departure from the previous case. Reasons for the distinction lie in the difference between the record in the previous case and the combined records now before us. Additional evidence adduced by both parties in the present case supplies greater detail not only to the complex business operations of Velan, but also to the general Canadian market relating to steam traps.

Careful consideration has been given to all of the cases cited in the briefs filed by counsel for the respective parties. Reference has been made herein to the cases deemed necessary to support the reasoning followed and the conclusions reached.

We find as facts:

1. That the merchandise involved herein was exported from Canada over the period of years, from 1951 through 1956, and consists of various types or models of steam traps, set forth in schedules titled "Velan Steam Traps," (plaintiffs' exhibit 6).

2. That, at the several times of exportation of the steam traps in question, such or similar merchandise was not freely offered for sale in Canada to all purchasers for home consumption or for export.

3. That, at the several times of exportation of the present merchandise, such or similar merchandise was not freely offered in the United States for sale to all purchasers, packed ready for delivery.

4. That official appraisements of the steam traps in question, on the basis of statutory cost of production, concededly the proper basis for appraisement of the present merchandise, did not follow the formula laid down under the mandatory provisions of section 402(f) of the Tariff Act of 1930.

5. That, as to the steam traps involved herein, appellants have failed to prove the amounts claimed as general expenses and as the profit ordinarily added, in the case of merchandise of the same general

character as the merchandise covered by these appeals, by manufacturers or producers in Canada engaged in the production or manufacture of merchandise of the same class or kind, and also have failed to prove the sum or sums which plaintiffs themselves actually added for profit.

We conclude as matter of law:

1. That, at the several times of exportation of the steam traps in question, there was no statutory foreign, export, or United States value therefor.

2. That cost of production, as defined in section 402(f), *supra*, is the proper basis for appraisement of the steam traps in question.

3. That the official appraisements of the present merchandise on the basis of cost of production are erroneous.

4. That appellants have not borne their burden of proof by showing "the usual general expenses," section 402(f)(2), and "an addition for profit," section 402(f)(4), within the requirements of the statute defining cost of production.

5. That the appraised values stay as the proper values for the present merchandise.

The judgment of the trial court is affirmed.

Judgment will be rendered accordingly.