**ELLIS SILVER CO., Inc.**

v.

**UNITED STATES.**

**R.D. 11688; Reappraisement R61/1760.**

United States Customs Court.

Dec. 31, 1969.

Lane, Young & Fox, New York City (James G. McGoldrick, New York City, of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Brian S. Goldstein and Andrew P. Vance, New York City, trial attys.), for defendant.

NEWMAN, Judge:

These five consolidated appeals for reappraisement involve the proper dutiable values of certain silverplated hollowware (silverplate on copper) exported from England during the period from December 9, 1959 to October 5, 1962 and entered at the port of New York.

The merchandise was appraised on the basis of constructed value, as defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas.Dec. 295, T.D. 54165. According to the official papers, which are in evidence without being marked, and defendant's brief, the constructed values were determined as follows:

*Reappraisements R6/1760 and R61/1772:* Invoiced unit prices, plus 5% representing an increase in factory list prices, less 5% representing a cash discount, less 2½% distributor's discount, plus the invoiced cost of cases.

*Reappraisement R61/22688:* Invoiced unit prices, plus 10% representing an increase in factory list prices, less 5% cash discount, less 2½% distributor's discount, plus the invoiced cost of cases.

*Reappraisements R62/14885 and R62/15687:* Invoiced unit prices, less 5% cash discount, plus the invoiced cost of cases.

Plaintiff contends that the appraised values are erroneous inasmuch as: (1) the proper basis of appraisement is export value, as defined in section 402(b) of the Tariff Act of 1930, as amended, rather than constructed value; and (2) in reappraisements R61/1760, R61/1772, and R61/22688, the appraiser should have made a 10% deduction for distributor's discount, rather than a 2½% deduction; and in reappraisements R62/14885 and R62/15687, the appraiser should have made an additional deduction of 10% for distributor's discount before adding the cost of packing cases.

The parties agree that the merchandise does not appear in the Final List promulgated by the Secretary of the Treasury, T.D. 54521.

For the reasons set forth herein, I have concluded that plaintiff has failed to sustain its burden of proof; and that the appraisements determined in the manner set forth above, although erroneous, nevertheless stand as the proper dutiable values.

STATUTES INVOLVED

Sec. 402(b): Export value. For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation,

in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Sec. 402(d): Constructed value. For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

Sec. 402(f): Definitions. For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

* * * * * * *

## THE RECORD

At the trial, Alfred E. Costigan testified on behalf of plaintiff. He had been associated with the importer, Ellis Silver Co., Inc. since 1926, and was president of the corporation from 1957 until his retirement in March 1963.

Plaintiff also introduced in evidence ten documentary exhibits which included price lists, letters from the foreign seller to plaintiff giving notice of increases in list prices, illustrated catalogs; and further, affidavits executed by Donald Joseph Winkley, chief financial officer of Ellis & Co. (Birmingham) Ltd., the foreign seller, and Martin C. Levi, an Ellis (Birmingham) director, as well as managing director of Barker Brothers Silversmiths, Ltd.

The pertinent facts established by the evidence may be summarized as follows:

The silverplated hollowware, the appraised values of which are contested,[1] was manufactured by Ellis & Co. (Bir-

---

1. "Hollowware," in the silverware trade, includes all articles which are not designated as flatware, i. e., knives, forks, and spoons (R. 48). The parties have stipu- lated to limit the merchandise involved in these cases to hollowware made of copper upon which has been plated silver by an electroplate process (R. 7, 10).

mingham), Ltd. Ellis Silver Co., Inc. was a wholly owned subsidiary of the foreign seller, and was engaged in importing and selling the involved merchandise to the retail trade in the United States. For many years, including 1959 to 1962, the seller sold the hollowware to plaintiff as an exclusive United States distributor. The manufacturer also sold the merchandise in England to one wholesaler, Walker & Hall, Ltd. of Sheffield, and to retailers. Additionally, the seller sold the merchandise for exportation to retailers in Canada, some Scandinavian countries, Italy, and South Africa.

The manufacturer followed the policy and practice of selling its merchandise in accordance with a published price list (exhibit 1), which was used in conjunction with an illustrated catalog (exhibit 5). The factory list prices were allegedly based upon cost of materials, labor, factory overhead, selling and advertising expense, management overhead, plus a 33⅓% markup for profit. None of the actual costs or expenses, however, are specified in the record.

During the relevant period of time in these cases the list prices were increased twice, on January 1, 1960 and February 1, 1962. These increases were communicated to the seller's customers by letters (exhibits 2 and 3) when such increases were to be effective prior to the publication of a new price list brochure (exhibit 4B). The price increases were "across the board", and were expressed in the letters in terms of a percentage addition to the factory list prices currently in effect, viz.: list price, plus 5% (exhibit 2) or list price, plus 10% (exhibit 3).

The seller granted all its customers a discount for cash, ranging from 2½% to 5%, and two purchasers were allowed a wholesaler's or distributor's discount of 5% or 10%. The wholesaler in England (Walker) received a cash discount of 2½% and a trade (wholesaler's discount of 5%, while retailers in England received only a 2½% cash discount. Plaintiff, on the other hand, was granted a 5% cash discount and a 10% distributor's discount on all purchases. Customers in Canada received only a cash discount, which varied from 2½% to 3¾%, while customers in other "third countries" received only a cash discount of 2½%. The manufacturer always sold on the basis of its published price list (plus any increases thereto) without regard to the quantity involved in the purchase. Wholesaler's or distributor's discounts were predicated upon the basis of lower distribution costs incurred by the manufacturer in sales to wholesalers as compared with sales to retailers.

The record also establishes that plaintiff acted as the exclusive agent for the manufacturer in Canada, and Canadian orders were transmitted directly to the manufacturer for acceptance, delivery, and billing. On these sales, plaintiff received a commission of 10% of the list price on orders accepted. In other "third countries," the manufacturer was represented by selling agents who received a commission of either 5% or 10% of the list price on orders accepted by the manufacturer.

The selling prices to plaintiff in these cases represent the factory list prices, plus any price increase (either 5% or 10%), less a 5% cash discount, less a 10%, distributor's discount, plus the invoiced cost of the packing cases. The sales were all ex-factory Birmingham, and the seller did not impose any restrictions on the disposition or use of the merchandise, except for territorial restrictions on resale.

Barker Brothers Silversmiths, Ltd. of Birmingham, England was engaged in substantially the same lines of business as Ellis (Birmingham) including the manufacture and sale of silverplated hollowware. During the pertinent period of time, and for a number of years prior thereto, Barker and Ellis (Birmingham) were affiliated through the former's ownership of the latter's stock, and a common board of directors. For all practical purposes both manufacturers were under joint management, but they retained their separate legal identities

until 1963 when Ellis (Birmingham) was merged into Barker.

Barker's silverplated hollowware was in some respects similar to that manufactured by Ellis (Birmingham), but the latter's line nevertheless was distinctive in its style, workmanship, and finish. According to Mr. Levi's affidavit, the articles manufactured by Ellis (Birmingham) are reproductions of "Old Sheffield Plate" and "Antique Silver Patterns," now museum or collector's pieces, and Ellis is "exclusive in this field." Both manufacturers used different price lists, and the Ellis (Birmingham) line consistently sold at a higher price level than did Barker's line, due mainly to higher production costs. Both Ellis (Birmingham) and Barker, however, followed substantially the same marketing, distribution, and discount policies. For example, Barker sold silverplated articles for exportation to the United States to its wholly owned subsidiary at list prices less a 5% cash discount and less a 10% distributor's discount. Like Ellis (Birmingham), Barker's United States sales were made exclusively to its wholly owned subsidiary. Plaintiff's witness Costigan was the president and chief executive officer of the Barker subsidiary, as well as plaintiff, and both subsidiaries shared offices and employees.

## THE LAW

▮ The merchandise was sold for exportation to the United States exclusively to plaintiff. Therefore, the importer was a "selected purchaser," which term has been construed as embracing situations where the seller expressly restricts his sales to one or more specifically designated purchasers. Aceto Chemical Co., Inc. v. United States, 51 CCPA 121, C.A.D. 846 (1964); Haddad & Sons, Inc. v. United States, 54 Cust.Ct. 600, R.D. 10942 (1965), aff'd 56 Cust.Ct. 792, A.R.D. 205 (1966).

▮ Plaintiff also comes within the scope of the statutory phrase "purchasers at wholesale," which *inter alia* covers those who purchase in the usual wholesale quantities for resale otherwise than at retail. Section 402(f) (3). It further appears that a principal market for such or similar merchandise was at Birmingham where the manufacturer made its sales, and the evidence shows that the selling prices did not vary according to the quantity purchased. The seller imposed no conditions or restrictions upon the use or disposition of the merchandise, other than the territory in which it could be resold.

There is no dispute that the sales to plaintiff were in the "ordinary course of trade," and no issue has been raised with respect to "principal market", nor with respect to "usual wholesale quantities." Hence, the issue is narrowed to whether the prices at which the merchandise was sold to plaintiff, a selected purchaser, fairly reflects its market value. That is the only section 402(b) export price to a selected purchaser acceptable under section 402(f) (1) (B), C. J. Tower & Sons of Niagara, Inc. v. United States, 60 Cust.Ct. 938, A.R.D. 233 (1968).

▮ Where merchandise is sold to a selected purchaser, the existence of an export value under section 402(b) and 402(f) (1) (B) depends upon whether or not there are sales in the ordinary course of trade at prices which fairly reflect the market value of the merchandise. United States v. Acme Steel Company, 50 Cust.Ct. 529, 534, A.R.D. 152, 216 F.Supp. 448 (1963), aff'd 51 CCPA 81, C.A.D. 841 (1964). If the prices to plaintiff do not fairly reflect the market value, the merchandise cannot be deemed "freely sold" within the scope of section 402(b) or 402(f) (1), and there is no statutory export value. Myerson Tooth Corporation v. United States, 61 Cust.Ct. 540, R.D. 11597 (1968), application for review pending.

Although there is no "hard and fast" rule as to what proofs are necessary in order to establish that the prices to a selected purchaser fairly reflect market value, nevertheless sufficient facts must be presented from which the court may

make the determination. Robert E. Landweer & Co., Inc. v. United States, 63 Cust.Ct., A.R.D. 261 (1969).

 It is now fundamental that the value of the exported goods in the foreign (home) market is relevant to the consideration of the price which fairly reflects the market value for export. United States v. Acme Steel, *supra*. Sales in the foreign market may include those for exportation to countries other than the United States ("third countries"), as well as for home consumption. *Myerson Tooth Corporation, supra* However, there is no requirement that "the price at which such merchandise is freely sold in the foreign market * * * be the same as the price at which it was * * * [sold] for exportation to the United States, for export value to exist." United States v. Acme Steel, 50 Cust.Ct. at 536. Thus, notwithstanding that plaintiff's evidence clearly establishes that the merchandise was sold for home consumption and for exportation to third countries at higher prices than those charged plaintiff, this fact alone would not preclude the lower selected purchaser prices from fairly reflecting market value. However, since the involved merchandise was sold at a higher price in the home market and for exportation to third countries, than for exportation to the United States, plaintiff's proofs must help the court reconcile the price differentials in order to establish that the price to plaintiff fairly reflected the market value. Such reconciliation must, as a minimum, be based upon a showing of the differing costs or expenses, if any, that entered into the different prices. *Myerson Tooth Corporation, supra; C. J. Tower & Sons, supra;* The American Greiner Electronic, Inc. v. United States, 62 Cust.Ct. 905, R.D. 11658, 298 F.Supp. 313 (1969), application for review pending. No such evidence was adduced in this case.

Plaintiff contends that one reason why Walker did not receive as much discount as plaintiff was because the home market wholesaler did not have to maintain an inventory due to its proximity to the factory, while plaintiff, being located in the United States, was required to maintain an inventory. There is nothing in the record, however, which establishes any differences in the inventory maintenance practices of the plaintiff and the home market wholesaler. Even assuming that plaintiff's contention with respect to the warehousing expense is true, no evidence was adduced showing the amounts of that expense; and moreover, there is no evidence showing how the inventory practices of the buyers affected the costs incurred or not incurred by the manufacturer, which is the primary concern in this case.

In C. J. Tower & Sons of Buffalo, Inc. v. United States, 56 Cust.Ct. 653, R.D. 11152 (1966), the court found that plaintiff had differences in warehousing costs by its showing of the amount of such costs and that such costs were not incurred by the exporter in connection with the exported merchandise, as compared with the merchandise sold for home consumption. This clearly was not shown in the instant case. If there were higher distribution costs or selling expenses in the home market than for exportation to plaintiff, the cost differentials should have been itemized and proven specifically in order that the court might determine whether in fact plaintiff's lower prices fairly reflected the market value of the merchandise. F. W. Myers & Co., Inc. v. United States, 58 Cust.Ct. 653, R.D. 11289 (1967); J. E. Bernard & Co., Inc. v. United States, 58 Cust.Ct. 598, R.D. 11265 (1967).

In *Bernard, supra,* the court stated (id. at 601):

* * * Where as here, the export price is lower than the price for home consumption, such differential must be satisfactorily explained. Ordinarily this involves a showing that some of the costs, incurred in sales for home consumption, are not elements entering into export sales. Where the cost differential is adequately accounted for and the export price is shown to be the home market price, less the

stated costs, it has been held that such export price fairly reflects the market value of the imported merchandise. \* \* \*

Pertinent to the instant case, the court in *Bernard* commented (id. at 601–602):

\* \* \* proof of the discount given to a United States subsidiary to defray its marketing expenses in the United States would not in any manner tend to prove that the discount is equal to the marketing expenses of such goods when sold by the exporting parent in its home market.

Clearly, the record in the instant case fails to meet the required proof with respect to establishing the cost differentials between home market sales to Walker and those for exportation to the United States.

Plaintiff's evidence relating to sales by the manufacturer to retailers in the home market and in third countries does not aid in establishing that plaintiff's lower prices fairly reflected the market value of the merchandise. In justification of the fact that the manufacturer allowed no discount (other than cash) to retailers, who were solicited either by commission agents in third countries, or by the manufacturer's salesmen in the home market, plaintiff argues that the seller had the expense of distribution or marketing services (including payment of agent's commissions), and also the expense of maintaining an inventory. Although such argument may be sound as a matter of economics and marketing, mere argument cannot substitute for the requisite proof as to the actual nonincurred costs in export sales to plaintiff. Mr. Levi's affidavit states: "In making sales to retailers in the home market, each company (Ellis and Barker) incurred the usual distribution costs that is, the cost of salesmen's salaries, commissions and travelling expenses, as well as the cost of advertising." However, none of the foregoing costs or expenses were disclosed, even assuming that they were not incurred in sales to plaintiff. Moreover, with respect to

agent's commissions, the manufacturer paid plaintiff a 10% commission for sales in Canada, but paid its Scandinavian agent, J. W. Bodington of Birmingham, England only a 5% commission, plus an undisclosed amount for travelling expenses, according to Mr. Winkley's affidavit. Under these circumstances, I do not find plaintiff's proof respecting sales to retailers probative that the lower discounted prices for export to the United States fairly reflected the market value of the merchandise.

In support of its position, plaintiff also adduced evidence at the trial relating to the sales practices of Barker and of the prices at which the latter sold its products, on the theory that there is a similarity between the instant merchandise and that manufactured and sold by Barker. Defendant, however, disputes the claimed similarity and stresses the fact that the prices for each manufacturer's line were different. In view of the differences established by the record between the Ellis (Birmingham) and Barker merchandise, I agree with defendant's contention. Furthermore, the record is clear that Ellis (Birmingham) products consistently commanded higher prices in the market place than did Barker's merchandise. Under the circumstances, Barker's sales practices (and prices) do not prove that the prices paid by plaintiff fairly reflect market value.

Finally, plaintiff has emphasized that the appraised values are expressed on the official papers as prices in a form which is comparable to, or parallel with, the method used by the seller to arrive at the net selling prices. Hence, certain percentages were added to the invoiced unit prices (5% or 10%) for increases in the factory list prices, certain other percentages were deducted (5% and/or 2½%) representing discounts for cash and/or distributor's discount, and the invoiced cost of cases was added thereto. I have noted that in its brief defendant has explained what the various percentages utilized in the appraisements represent. Both parties are, therefore, in

agreement concerning that fact. Additionally, the parties have stipulated that the basis of appraisement was constructed value under section 402(d) of the Tariff Act of 1930, as amended. But unfortunately, the method used by the Government to determine the so-called constructed values was in utter disregard of the statutory formula prescribed by Congress.

In United States v. A. N. Deringer, Inc., 46 Cust.Ct. 762, 768, A.R.D. 127 (1961), appeal dismissed 48 CCPA 169 (1961), the court found the appraisement on the basis of cost of production to be erroneous, and observed:

> The appraiser's finding of cost of production, as hereinabove outlined, does not follow the controlling statute. There is nothing in the clear and unambiguous language of the statutory definition of cost of production, section 402(f) of the Tariff Act of 1930, that allows for a determination of such value through a *series of deductions (estimated costs) from a selling price,* as adopted by the appraiser in this case. \* \* \* [Emphasis added.]

See also A. N. Deringer, Inc., et al. v. United States, 54 Cust.Ct. 764, A.R.D. 182 (1965), aff'd 53 CCPA 135, C.A.D. 890 (1966), for the same holding. And cf. Carey & Skinner, Inc. v. United States, 12 Cust.Ct. 352, R.D. 5975 (1944), decided on remand 16 Cust.Ct. 361, R.D. 6279 (1946).

Granted that neither the appraising officer, nor counsel for the Government, was obliged to divulge the method or mechanics of arriving at the "constructed values." Nevertheless, having volunteered to do so, it must appear that the appraiser utilized all of the statutory elements in arriving at the appraised values, taking into consideration that the appraiser could use all reasonable ways and means to determine those elements. Section 500, Tariff Act of 1930. In the instant case, the elements of the appraised values do not bear even a remote resemblance to those prescribed by section 402(d). Consequently, I find that

the constructed value appraisements are erroneous.

Since plaintiff has failed to establish its claimed export values, the appraised values, although erroneous, must prevail as the proper dutiable values for the instant merchandise. A. N. Deringer, Inc., et al. v. United States, 54 Cust.Ct. 764, A.R.D. 182 (1965), aff'd 53 CCPA 135, C.A.D. 890 (1966). In *Deringer,* the court found that the official appraisements on the basis of statutory cost of production did not follow the formula laid down under the mandatory provisions of section 402(f) of the Tariff Act of 1930. Thereupon, the court determined that the appraisements were erroneous, but concluded "that the appraised values stay as the proper values for the present merchandise." (id. at 773.)

 As noted above, plaintiff has failed to establish its claimed export values. Thus, in accordance with the *Deringer* holding, I am constrained to find that the appraised values, although erroneous, prevail as the proper dutiable values for the merchandise.

The court makes the following findings of fact:

1. The merchandise involved herein consists of various items of silverplated hollowware (silverplate on copper), which was exported from England during the period from December 9, 1959 to October 5, 1962, by the manufacturer, Ellis & Co. (Birmingham), Ltd., and entered by plaintiff at the port of New York.

2. The involved articles do not appear on the Secretary's Final List published in 93 Treas.Dec. 14, T.D. 54521, issued pursuant to the Customs Simplification Act of 1956.

3. The imported merchandise was appraised on the basis of constructed value, as defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas.Dec. 295, T.D. 54165.

4. The official papers and defendant's brief disclose that the constructed values were determined as follows:

*Reappraisements R61/1760 and R61/1772*: Invoiced unit prices, plus 5% representing an increase in factory list prices, less 5% representing a cash discount, less 2½% distributor's discount, plus the invoiced cost of cases.

*Reappraisement R61/22688*: Invoiced unit prices, plus 10% representing an increase in factory list prices, less 5% cash discount, less 2½% distributor's discount, plus the invoiced cost of cases.

*Reappraisements R62/14885 and R62/15687*: Invoiced unit prices, less 5% cash discount, plus the invoiced cost of cases.

5. During the period of exportation herein, the merchandise was sold for exportation to the United States only to plaintiff.

6. Such sales were in the ordinary course of trade, and the selling prices did vary according to the quantities purchased.

7. There were no restrictions as to the disposition or use of the merchandise except for the territory in which the merchandise could be resold.

8. During the period of exportation, such merchandise was sold for home consumption to a wholesaler and to retailers; and the merchandise was also sold in third countries to retailers through commission agents.

9. The net prices which the seller charged plaintiff were lower than those charged the purchasers in the home market and in third countries.

10. Plaintiff has failed to establish the differing costs or expenses, if any, that entered into the different net prices, and hence has failed to reconcile the price differentials.

The court concludes as a matter of law:

1. Plaintiff was a selected purchaser within the purview of section 402(f) (1) (B).

2. On the evidence of record, plaintiff has failed to establish that the prices paid fairly reflect the market value of the merchandise; accordingly, plaintiff has failed to show that there was an export value.

3. The methods utilized by the Government in determining the constructed values, do not conform to the formula prescribed by section 402(d), as amended. Hence, the appraisements are erroneous.

4. Since plaintiff has not sustained its burden of proving the claimed export values, the appraisements, although erroneous, remain the proper dutiable values of the merchandise.

Judgment will be rendered accordingly.