I therefore make the following conclusions of law:

1. Export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for determining the value of the merchandise herein.

2. Plaintiffs have failed to overcome the presumption of correctness attaching to the appraised values found by the district director.

3. The correct export values herein are the appraised values.

Judgment will be entered accordingly.

(R.D. 11765)

Ampex Professional Products Co. v. United States

(Decided March 14, 1972)

*Glad & Tuttle* (*George R. Tuttle* of counsel) for the plaintiff.

*L. Patrick Gray III*, Assistant Attorney General (*Gilbert Lee Sandler*, trial attorney), for the defendant.

WILSON, Judge: The involved merchandise herein, consisting of six Marconi Mark IV television cameras and parts, purchased by plaintiff-importer from the manufacturer, The Marconi Company Limited (Marconi) of Chelmsford, England, and exported from that country on January 31, 1964, was appraised on the basis of export value, as defined in section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, utilizing the sales price to the "least favored purchaser at wholesale",[1] the Columbia Broadcasting System (CBS) of Mark IV television camera equipment which had been modified in part to meet CBS' specifications. Each of the 20-odd different items comprising this shipment was appraised, as indicated by the red ink markings on the customs invoice, at "Invoice Unit values, plus 11.11%, pkd."

Plaintiff, in agreement with defendant that the merchandise is not on the Final List (T.D. 54521) and that export value is the proper basis of appraisement, contends that the invoice unit prices, packed, are the correct dutiable values.

The pertinent provisions of section 402, Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, are as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of

---

[1] Exhibit 1, discussed *infra.*

exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

(f) DEFINITIONS.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

(3) The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantites.

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

(A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

(B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

(C) Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

(D) Merchandise which satisfies all the requirements of subdivision (C) except that it was produced by another person.

The record consists of the testimony of three witnesses called by plaintiff, and one exhibit. The Special Customs Invoice and accompanying papers were received in evidence without being marked (R. 5).

James Scott, the import specialist who had handled the subject entry and advisorily appraised the merchandise, testified that the addition of 11.11 percent which was made to reflect the sales price of the Mark IV camera equipment to CBS was based on a Bureau of Customs ruling (exhibit 1) resulting from an inquiry into the relationship of Marconi with Ampex and CBS.

Exhibit 1, dated April 8, 1965, is a letter addressed to plaintiff's counsel stating in pertinent part:

> The record in this case reflects that the manufacturer sells its merchandise for export to the United States at two prices without regard to the quantities purchased. To the Columbia Broadcasting System (CBS), an industrial user, and to other users, sales are made at the full price without discount. The report reflects that the price to the CBS takes into account certain modifications made to the CBS's own specifications. CBS's purchasing agent and engineer handling this equipment reports, however, that these modifications are minor in nature, such as different paint colors and different connectors, hinges, focus handles, etc.
>
> Ampex Video Products Company, a wholesaler, purchases at the CBS prices less 10 percent (less 5 percent prior to September 22, 1962). The manufacturer states that the discount is granted to Ampex in view of the services it provides to its purchasers, which services the manufacturer provides on direct sales to end users. These special services rendered by Ampex were previously enumerated as follows:
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*
>
> It is the Bureau's opinion that the manufacturer's policy in selling to purchasers for export to the United States reflects different prices to different classes of purchasers at the wholesale level, section 402(f) (3). Hence, the appraisement of television cameras and parts, pursuant to section 402, should proceed on the basis of export value as reflected by the price to the CBS, the least favored purchaser at wholesale.
>
> This price is reflected either by the f.o.b. price to the CBS, net, or the f.o.b. price to Ampex, plus 11.11 percent (100 percent divided by 90 percent). \* \* \*

The second witness, Stanley John Leeson, who has been employed by Marconi since 1954, was chief of sales in 1963 and 1964 for its studio broadcasting equipment and responsible for sales in Europe and the Americas and, from 1966 to 1969, was Marconi's resident engineer at Ampex. He stated that, during the 1963–1964 period, sales in the United States were limited to Ampex, which was then Marconi's representative in this country for all television equipment, and to the CBS Television Network in New York with which Marconi had had a marketing agreement prior to the arrangement with Ampex.

Ampex, Leeson testified, sold its cameras to television stations in the United States, whereas CBS used the cameras to produce network programs in its network studios in Hollywood, California and New York City. The stations owned and operated by CBS, such as station KNXT, in Los Angeles, are not part of the network situation, but serve as "the local outlet for programming from C.B.S." (R. 28).

CBS required certain modifications of the Mark IV camera equipment, including a different color paint and incorporation of a different yoke assembly. The witness explained (R. 16):

> A yoke, [is] a portion of the camera that contains the pick-up tube that sees the scene. They have a studio in New York which is subjected to extremely high magnetic fields, and we had to make special provisions within the equipment to enable the camera channel to work satisfactorily in this environment. Different connectors were used on some portions of the camera channel. They had a different type of focus handle mechanism fitted to enable focus of the picture to be made in the way they wanted it to be done, rather than the general method normally employed. Many of these little things were changed.

These differences would cause an increase in the sales price to CBS as, in some cases, "they were specially manufactured" (R. 16). Ampex imported the European focus handle and CBS insisted on its own styling. The witness did not know the difference in cost between the American and United Kingdom style focus handles, but "would say" that the difference in value between the connectors imported by CBS and Ampex "was something of the order of 1 percent of the value of the equipment" (R. 29).

CBS also paid a higher price because Marconi was responsible to it for product maintenance, up-dating of information and modifications, but "did not have to do this to the same extent for Ampex" (R. 17), which accepted responsibility for aftersales service and spare parts. Ampex also promoted the Marconi camera and advertised it in broadcast magazines. Leeson regarded the sales to Ampex as at wholesale and those to CBS as sales to an end user.

The Mark IV cameras sold and used in the United States are fundamentally different from those used in the United Kingdom and in

Europe with respect to television line standards: the United States operates on a 525 line, England, on a 405 line, and Europe, on a 625 line standard. This variation requires many components within the circuitry of the camera channel to be different. Modification of the line standards in cameras manufactured for sale in the United Kingdom, as compared to those made for sale to Ampex, would provide an additional manufacturing cost "in the order of 5 to 10 percent" (R. 20). However, if the identical Ampex camera were sold in the English market it would bring the identical price, exclusive of the additional sales service and other services Marconi provides to its end user customers in England.

The third witness, video products manager in 1964 for the Video Products Division of Ampex, stated that Ampex provided aftersales service to its customers, and advertising and sales promotion for its products.

Plaintiff contends that both Ampex and CBS are selected purchasers at wholesale within the meaning of section 402 (f) (1) (B) ; that sales to Ampex, a purchaser for resale, take precedence over sales to CBS, which purchases "similar", not "identical" or "such", merchandise as an end user and not for industrial use; that the export sales prices to Ampex fairly reflect the market value of the merchandise; and that such sales were made in the ordinary course of trade.

Before evaluating the record, it is important to consider the nature of the appraisements herein which are expressed in terms of the invoice unit values plus the disputed addition of 11.11 percent.

It is settled that where merchandise is appraised on the basis of invoiced unit values, plus specific added changes, to arrive at dutiable export value, the appraisement is deemed to be separable. *United States* v. *Pan American Import Corp., et al.*, 57 CCPA 134, C.A.D. 993 (1970) ; *Joseph A. Paredes & Co., a/c Andrew D. Darvas Co.* v. *United States*, 63 Cust. Ct. 557, R.D. 11675 (1969). Accordingly, a party attacking the appraisement may rely upon the presumption attending the appraised invoiced unit prices exclusive of the contested addition. *United States* v. *Bud Berman Sportswear, Inc.*, 55 CCPA 28, C.A.D. 929 (1967). As there is "still a presumption of correctness attaching to the appraiser's *result* which is independent of the presumption of correctness attaching to the appraiser's subsidiary findings" [italics copied], the burden remains with the party of proving that such or similar merchandise was freely sold or offered for sale in the ordinary course of trade in accordance with the statutory definition of export value at the claimed invoice unit prices. *B & W Wholesale Co., Inc.* v. *United States*, 58 CCPA 92, C.A.D. 1010 (1971) ; *United States* v. *Pan American Import Corp., et al., supra.*

Section 402(f)(1) defines "freely sold or, in the absence of sales, offered for sale" to mean sold or, in the absence of sales, offered (A) to all purchasers at wholesale, or (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise, without restrictions on its use or disposition by the purchaser.

The separable appraisement principle is applicable to "selected purchasers at wholesale" as well as to "purchasers at wholesale". *United States* v. *Bud Berman Sportswear, Inc.*, 66 Cust. Ct. 628, A.R.D. 287 (1971), appeal pending; *Joseph A. Paredes & Co., a/c Andrew D. Darvas Co.* v. *United States, supra.* As Judge Rosenstein observed in *Bud Berman, supra,* pages 635-636:

> * * * the doctrine of severability is not reached until the importer has shown that the goods were sold in the ordinary course of trade to a selected purchaser at wholesale at a price which fairly reflected the market value of the merchandise on an ex-factory basis. Only then, when he has established that the goods were "freely sold" within the meaning of the statute, may plaintiff rely upon the presumption of correctness attaching to the ex-factory price utilized by the appraiser in finding value. The importer who is a selected purchaser is not relieved from his burden of establishing that the transactions at bar were "in the ordinary course of trade" and that the claimed prices fairly reflected the market value of the imported merchandise.

Turning to the instant case, it is not disputed that Ampex, the sole representative in the United States for Marconi's television equipment was a selected "purchaser at wholesale" within the meaning of section 402(f)(3), *supra;* hence, it was incumbent upon plaintiff to offer evidence to establish that the claimed prices fairly reflected the market value of the subject merchandise and that the transactions at bar were in the ordinary course of trade.

Although there is no hard and fast rule as to what proofs are necessary to establish that prices to a selected purchaser fairly reflect market value, it is now fundamental that all sales of such or similar merchandise in the ordinary course of trade in the home market (country of export) are proper for consideration. *United States* v. *Acme Steel Company*, 51 CCPA 81, C.A.D. 841 (1964). Thus, sales in the home market for domestic consumption, to third countries, and to other selected purchasers in the United States are, under appropriate circumstances, relevant and pertinent to such an inquiry. *New York Credit Men's Adjustment Bureau, Inc., et al.* v. *United States*, 64 Cust. Ct. 770, R.D. 11715, 314 F. Supp. 1246 (1970), review pending; *Globe Shipping Co., Inc.* v. *United States*, 63 Cust. Ct. 639, R.D. 11687, rehearing denied January 28, 1970.

As Judge Watson stated in *Myerson Tooth Corporation* v. *United States*, 64 Cust. Ct. 860, 863, A.R.D. 273, 313 F. Supp. 1016, 1018 (1970) :

> It happens to be the case that most of the decisions since *United States* v. *Acme Steel Company, supra,* have dealt with the issue of selected purchaser and the market value from which to judge a fair reflection in the context of prices for home consumption in the country of exportation. This, however, does nothing to detract from the legitimacy of making an inquiry into sales in the country of exportation for consumption in third countries. Such proofs of prices for export to third countries would, if they are reconcilable with the price to a selected purchaser, buttress the arguments of the selected purchaser. If they are not, they would tend to cast doubt on the "fairness" of the price in question.

> It must be borne in mind that the scope of inquiry which we justify in this decision is not a mandatory one. That is to say, it may be sufficient in a given situation for the selected purchaser to prove only that the price it pays reflects the price for home consumption in the country of manufacture. See *Intercontinental Fibres, Inc.* v. *United States,* 64 Cust. Ct. 618, R.D. 11692 (1970), application for review pending.[2] Proof regarding sales to other countries may assist the selected purchaser in proving that its price is a fair reflection of the market value in a situation where sales in the home market are nonexistent or discredited in some manner, or may, as here, help the defendant to discredit the price set forth as export value and supported solely by the proof of sales for home consumption.

And in *Ellis Silver Co., Inc.* v. *United States,* 67 Cust. Ct. 564, A.R.D. 293 (1971), appeal pending, affirming *Id.* v. *Id.,* 63 Cust. Ct. 647, R.D. 11688, 308 F. Supp. 704 (1969), the Appellate Term quoted the trial judge's comment that—

> * * * notwithstanding that plaintiff's evidence clearly establishes that the merchandise was sold for home consumption and for exportation to third countries at higher prices than those charged plaintiff, this fact alone would not preclude the lower selected purchaser prices from fairly reflecting market value. However, since the involved merchandise was sold at a higher price in the home market and for exportation to third countries, than for exportation to the United States, plaintiff's proofs must help the court reconcile the price differentials in order to establish that the price to plaintiff fairly reflected the market value. Such reconciliation must, as a minimum, be based upon a showing of the differing costs or expenses, if any, that entered into the different prices. [citing cases]

Plaintiff, mindful of the aforecited proof requirements, concedes that the Marconi Mark IV camera equipment was sold at higher prices

---

[2] Reversed on other grounds, *United States* v. *Intercontinental Fibres, Inc.,* 66 Cust. Ct. 658, A.R.D. 291 (1971).

for domestic consumption in England and for export to Europe (without stating what the prices were) than for export to Ampex in the United States, but urges that domestic and third country sales should be disregarded because of the substantial fundamental difference in television cameras produced for those markets from the ones manufactured for use in the United States.

I agree that the different television line standards used in the various countries, which requires many components within the circuitry of the camera channel to be different, a fact undisputed by defendant, resulted in the production of equipment substantially dissimilar [3] and therefore inappropriate for comparison purposes in considering whether the claimed values fairly reflect the market value of the imported merchandise.

The sales to CBS, however, are another story. Plaintiff attempts to disassociate these transactions from consideration on various grounds, the primary one being that CBS is not within the first category of "purchasers at wholesale" defined in section 402(f)(3), namely, purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail. The production of taped television programs which are subsequently broadcast over television stations is not, plaintiff urges, an industrial use.

I do not agree. The business of producing network programs for broadcasting on a network affiliate is a known, recognized, albeit occasionally controversial, practice which constitutes a major economic factor in the billion dollar television industry. I am unable to perceive any significant difference, in assaying "industrial use" under the valuation statute, between the use of articles such as the steel strapping involved in *United States* v. *Acme Steel Company, supra,* and the articles at bar.

Furthermore, assiduous research into the legislative history of the Customs Simplification Act of 1956 fails to disclose any intent to give the term "industrial use" the narrow meaning ascribed to it by plaintiff. In the absence of such a showing, the appraising officer's presumptively correct finding that CBS purchased the cameras for "industrial use" has not been overcome.

---

[3] Merchandise manufactured for use in a foreign market which, by reason of its special design and construction, is incapable of being used in the United States, is not commercially interchangeable and, therefore, not "similar" merchandise for purposes of customs valuation. *C. J. Tower & Sons* v. *United States,* 50 CCPA 76, C.A.D. 824 (1963) ; *B. A. McKenzie & Co., Inc.* v. *United States,* 47 CCPA 143, C.A.D. 748 (1960) ; *United States* v. *Ford Motor Company,* 46 Cust. Ct. 735, A.R.D. 124 (1961).

Inasmuch as the Bureau ruling (exhibit 1) which determined the basis of appraisement herein did not utilize or even consider sales for home consumption or for exportation to third countries, presumably as not reflective of sales of such or similar merchandise, this aspect of plaintiff's proofs appears to be academic.

I do not agree with plaintiff's additional contention that the modifications in some of the items sold to CBS removed its Mark IV camera equipment from the first category of "such or similar merchandise" employed in the export value formula, and defined in section 402(f)(4)(A) as

The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

Changes in the style of a focus handle, invoiced herein at $5.35, and of connectors, invoiced at prices ranging from $2.59 to $5.80, out of over 20 items totaling over $8,300 in unit f.o.b. prices, without any showing of the actual dissimilarities or of a lack of commercial interchangeability, are, to my mind, inconsequential. Also, mere modification of the yoke assembly, invoiced herein at $752.21, without specifying the nature and extent of the modification or the actual costs involved, is not sufficient to overcome the Bureau's findings that the change was "minor in nature" (exhibit 1).

Finally, plaintiff's explanation that higher prices to CBS covered other costs and services which were not provided to Ampex "to the same extent" (whatever that means), and that Ampex accepted responsibility for aftersales service and spare parts in addition to promoting and advertising the Mark IV equipment, unaccompanied by evidence of the actual costs or expenses entering into the different prices, fails to reconcile the price differentials between the CBS and Ampex Mark IV cameras. *Ellis Silver Co., Inc.* v. *United States, supra; Myerson Tooth Corporation* v. *United States, supra; J. E. Bernard & Co., Inc.* v. *United States*, 58 Cust. Ct. 598, R.D. 11265 (1967). Accordingly, the evidence of record is insufficient to overcome the appraising officer's presumptively correct finding that the prices paid by Ampex did not fairly reflect the market value of the merchandise. *Mannesmann-Meer, Inc.* v. *United States*, 58 CCPA 6, C.A.D. 995 (1970).[4]

I find as facts:

1. The imported merchandise consists of six Marconi Mark IV television camera channels, each consisting of over 20 separately invoiced items, exported from England on January 31, 1964.

2. The merchandise does not appear on the Final List promulgated by the Secretary of the Treasury, T.D. 54521.

3. The merchandise was appraised on the basis of export value as defined in section 402(b), Tariff Act of 1930, as amended by the

---

[4] In light of the foregoing, it is unnecessary to consider whether sales to Ampex were "in the ordinary course of trade".

Customs Simplification Act of 1956, at the invoiced unit price plus 11.11 percent, packed, for each item involved.

4. The appraisements herein are separable.

5. Ampex is a selected purchaser at wholesale purchasing for resale otherwise than at retail within the meaning of section 402(f)(1)(B).

6. Plaintiff has failed to overcome the appraising officer's presumptively correct finding that CBS is a selected purchaser at wholesale for industrial use, within the meaning of section 402(f)(1)(B), of such or similar merchandise, as defined in section 402(f)(4)(A).

7. Plaintiff has failed to overcome the appraiser's presumptively correct finding that the prices paid by Ampex herein fairly reflect the market value of the merchandise.

I conclude as matters of law:

1. Plaintiff has failed to overcome the presumption of correctness attaching to the appraised values.

2. Export value, as defined in section 402(b), Tariff Act of 1930, as amended, *supra*, is the proper basis of valuation for the subject merchandise.

3. Said values are the appraised values.

Judgment will be entered accordingly.